7 So.3d 397 (2005)
Patricia BLACKMON
v.
STATE of Alabama.
CR-01-2126.
Court of Criminal Appeals of Alabama.
August 5, 2005.
Opinion Overruling Rehearing August 25, 2006.
Certiorari Denied October 17, 2008 Alabama Supreme Court 1051723.
*406 Brief on original submission filed by Clark Maurice Parker, Dothan, for appellant.
Michael Crespi, Dothan, and Bryan Stevenson, Montgomery, for appellant on application for rehearing.
William H. Pryor, Jr., and Troy King, attys. gen., and Bill Lisenby, Jr., deputy atty. gen., and Stephen Shows, asst. atty. gen., for appellee.
William H. Pryor, Jr., and Troy King, attys. gen., and Bill Lisenby, Jr., deputy atty. gen., and Stephen Shows and Cheryl Ann Schuetze, asst. attys. gen., for appellee on application for rehearing.
McMILLAN, Presiding Judge.
The appellant, Patricia Blackmon, was convicted of capital murder in the beating death of her 28-month old daughter, Dominiqua. See § 13A-5-40(a)(15), Ala.Code 1975, which makes capital the intentional murder of a child under 14 years of age. The jury, by a vote of 10 to 2, recommended that Blackmon be sentenced to death. The circuit court followed the jury's recommendation and sentenced Blackmon to death. This appeal followed.
The State's evidence tended to show that on May 29, 1999, Blackmon telephoned emergency 911 to summons paramedics to her mobile home in Dothan. She told the 911 operator that her child was not breathing. Eddie Smith, a paramedic in Dothan, testified that he arrived at Blackmon's mobile home at around 9:30 p.m. and that he found Dominiqua lying on the floor of the master bedroomshe was wearing only a diaper and blood-soaked *407 socks, was covered in vomit, and was not breathing. There was a hematoma on her forehead and blood on her chest. After the paramedics attempted to revive her, she was transported to Flowers Hospital Emergency Room.
Dr. Matthew Krista testified that he treated Dominiqua when she was brought to the emergency room. He said that he first established an airway but that at 10:22 p.m. she was pronounced dead. Dominiqua's pediatrician, Dr. Robert Head, was also called to the emergency room. Both doctors testified that the child had multiple bruises and contusions and an imprint of the sole of a shoe on her chest.[1] They also said that they observed marks from previous injuries on her body.
Dr. Alfredo Parades, the medical examiner who conducted the autopsy, testified that Dominiqua died of multiple blunt-force injuries to her head, chest, abdomen, and extremitieshe detailed some 30 injuries that he discovered on the child's body. Dr. Parades testified:
"She has bruises in the front part of the lower chest and upper abdomen. Bruises around the right groin. She has a fracture, this is the fracture of the leg. And, on her side, she has bruises on the left temporal area above the ear. She has bruises on ... the ear on the left. She had a bruise on the right cheek area. She had a bruise on the side of the heel and foot area. Then on the back, she had multiple bruises on the lower back, bilaterally. That is both sides. Bruises of the buttocks, bruises behind the knee area and below the knee area. And in addition to that, she had numerous linear, what I describe as in parallel, like a train tack. There were numerous injuries with a pale area in between ... the left buttock area."
(R. 873.) Parades also said that Dominiqua had two broken bones and many other injuries that were in various stages of healing. Parades also described many internal injuries. He said that Dominiqua also had an imprint of the sole of a shoe on her chest.
Dr. James Downs, chief medical examiner for the State of Alabama, testified that he compared the sandals Blackmon was wearing on the day of the murder with the scanned image of the victim's chest, and it was his opinion that the imprint on Dominiqua's chest was consistent with the sole of the sandals. Downs also testified that it was his opinion that Dominiqua's recent injuries were consistent with having been made by a pool cue.
There was testimony indicating that Blackmon had adopted Dominiqua approximately nine months before she was killed. Testimony also showed that Blackmon had sole charge of the child from the time her father-in-law saw the two of them earlier on the evening of the murder until the time of the child's death. Wayne Johnson, Blackmon's father-in-law, testified that on the night Dominiqua was killed he saw Dominiqua and she was playing and acting normal. He said that Blackmon and Dominiqua left his house at around 8:00 p.m.
A search of Blackmon's mobile home revealed several blood-splattered items. Forensic tests revealed the presence of blood on a broken pool cue, a child's T-shirt, a pink flat bed sheet, a quilt, and two napkins. The blood matched Dominiqua's blood.
Blackmon called several witnesses to testify in her defense. Judy Whatley, an employee of the Department of Human Resources, said that she had had contact *408 with Dominiqua and Blackmon once a month for five months before August 1998 and that she noticed that the two had a good relationship. Tammy Freeman, Blackmon's neighbor, testified that she frequently left her children with Blackmon.
The jury convicted Blackmon of capital murder. A separate sentencing hearing was held, at which the State relied on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel to support a death sentence. After the sentencing hearing the jury, by a vote of 10 to 2, recommended that Blackmon be sentenced to death. The circuit court held a separate sentencing hearing after the presentence report was prepared. The circuit court sentenced Blackmon to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-55, Ala.Code 1975.

Standard of Review
Blackmon has been sentenced to death. According to Rule 45A, Ala.R.App.P., this Court must review this case for plain error. Rule 45A states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
When discussing the application of the plain-error standard of review, this Court has stated:
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Hall v. State, 820 So.2d 113, 121-22 (Ala. Crim.App.1999), aff'd, 820 So.2d 152 (Ala. 2001), cert. denied, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002). While the failure to object will not preclude our review, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).

I.
Blackmon argues that the circuit court erred in denying her motion requesting discovery of the transcript of the grand-jury proceedings. Specifically, she argues that, because she was indicted for capital murder, she had a "special" need to review the grand-jury proceedings.
Blackmon was indicted for capital murder in August 1999. In March 2001, Blackmon moved that she be allowed discovery of the transcript, exhibits, and any other memorialization of the grand jury proceedings. The motion listed only one ground in support of the discovery of this evidencethat Blackmon had been indicted for capital murder.
*409 Alabama has long protected the secrecy of grand-jury proceedings. See § 12-16-214, Ala.Code 1975. "The long time rule, sanctioned by our courts, is that the proceedings before a grand jury are essentially secret." Steward v. State, 55 Ala.App. 238, 240, 314 So.2d 313, 315 (Ala. Crim.App.1975). However, a defendant may be allowed to inspect grand-jury proceedings if the defendant meets the threshold test of showing a "particularized need" for breaching the secrecy of those proceedings. As this Court stated in Millican v. State, 423 So.2d 268 (Ala.Crim. App.1982):
"Before a defendant is allowed to inspect a transcript of a State's witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony, see Palermo [v. United States, 360 U.S. 343 (1959),] and Pate [v. State, 415 So.2d 1140 (Ala.1981)], the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness' grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant's testimony. In this case no such showing was made and the existence of any inconsistency between the witness' trial and grand jury testimony was never even alleged. Cooks [v. State, 50 Ala. App. 49, 276 So.2d 634 (Ala.Crim.App. 1973)]. Also, there was no showing that the witness' grand jury testimony, if available, was `of such nature that without it the defendant's trial would be fundamentally unfair.' Cooks, 50 Ala. App. at 54, 276 So.2d 634. See also Husch v. State, 211 Ala. 274, 276, 100 So. 321 (1924). ('Moreover, if the solicitor had had such a statement in his possession, defendant could have required its production by a rule of the court if he thought it was favorable to him.')
"In laying the proper predicate for examination of a witness' grand jury testimony, it should also be established that the witness testified before the grand jury and that such testimony was recorded or reduced to writing, unless a grand juror will be called to disclose the testimony of the witness. Alabama Code 1975, Section 12-16-201.
"`When the defendant, in effect, asks for the State District Attorney to produce a document, he should at least establish that this State official has such document or a copy thereof in his possession before the trial court will be put in error.' Strange v. State, 43 Ala.App. 599, 606, 197 So.2d 437 [(1966)], cert. dismissed, 280 Ala. 718, 197 So.2d 447 (196[7]).
"Once the defendant has laid a proper predicate for the impeachment of a witness who testified before the grand jury, the trial judge should conduct an in camera inspection as outlined in Palermo, supra, and Pate, supra, to determine (1) whether the statement made by the witness before the grand jury `differed in any respects from statements made to the jury during trial,' Pate, supra, and (2) whether the grand jury testimony requested by the defendant `was of such a nature that without it the defendant's trial would be fundamentally unfair.' Pate, supra. This procedure will best preserve and protect the legislative determination that `it is essential to the fair and impartial administration of justice that all grand jury proceedings be secret and that the secrecy of such proceedings, remain inviolate.' Alabama *410 Code 1975, Sections 12-16-214 through 226."
423 So.2d at 270-71.
Nonetheless, Alabama has no statute that requires that grand-jury proceedings be recorded or otherwise memorialized. In Stallworth v. State, 868 So.2d 1128 (Ala. Crim.App.2001), the defendant argued that the circuit court erred in denying her motion to transcript the grand-jury testimony. In upholding the circuit court's ruling, we stated:
"`In Alabama there is no statute requiring that testimony before a grand jury be recorded. "A Grand Jury is not required to compile records and the testimony in the absence of a statute requiring preservation of the proceedings. State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779 [(Ala.Crim. App.1974)]. There is no such statute in this state." Sommerville v. State, 361 So.2d 386, 388 (Ala.Cr.App.), cert. denied, 361 So.2d 389 (Ala.1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979). See also Gaines v. State, 52 Ala.App. 29, 30, 288 So.2d 810, 812, cert. denied, 292 Ala. 720, 288 So.2d 813 (1973), cert. denied, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Because there was no legal requirement that the grand jury proceedings be recorded, this contention is without merit.'"
Stallworth, 868 So.2d at 1139, quoting Hardy v. State, 804 So.2d 247, 287 (Ala. Crim.App.1999), aff'd, 804 So.2d 298 (Ala. 2000). See also Steward v. State, supra.
At the pretrial hearing on this motion, the prosecutor stated that it was the policy of the district attorney's office to not record the grand-jury proceedings and that he had no knowledge that the grand-jury proceedings had been recorded in this case. Neither did Blackmon show a "particularized need" to breach the secrecy of the grand-jury proceedings. Based on the cases cited above, we conclude that the circuit court committed no error in denying this motion made after Blackmon had been indicted. Cf. McKissack v. State, 926 So.2d 367 (Ala.2005) (request to preserve grand-jury proceedings was made before grand jury was empaneled).

II.
Blackmon argues that the circuit court erred in denying her motion for a change of venue. Blackmon states in her brief that there was evidence that approximately 60% of the households in Houston County may have been exposed to prejudicial pretrial publicity about the case and that the community was so saturated with pretrial publicity that she could not get a fair trial there. She also asserts that by the very nature of the charge against her, there is a presumption of prejudice.
At the hearing on the motion for a change of venue, two media representatives testified. Bill Perkins, editorial page editor for the Dothan Eagle, testified that he retrieved three articles that had been written about the child's murder and that the paper circulated to approximately 60% of the households in Houston County. Wayne May, senior reporter for WTVY television station, testified that a number of stories had been broadcast about the case.
After the evidentiary hearing the circuit court issued the following order denying the motion:
"Evidence at the hearing consisted of two witnesses, a representative for the Dothan Eagle and a reporter for WTVY television. The newspaper editor testified that a few newspaper articles were written over a period of time concerning this particular case. The television station ran a number of stories consisting of the same information but repeated *411 during newscasts during the day. The coverage regarding this case has been relatively minor when compared to other `high profile' capital cases. Nonetheless, several editorial opinion pieces were denunciatory but made scant mention of the Defendant....
"The Defendant has failed to show community saturation or even widespread publicity. As stated in ... Oryang v. State, [642 So.2d 979 (Ala.Crim. App.1993)], `... in order for a defendant to show prejudice, the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.'
"It is therefore, ordered, adjudged and decreed that defendant's motion for a change of venue is hereby denied."
(C.R. 194-95.)
In Blanton v. State, 886 So.2d 850, 876-77 (Ala.Crim.App.2003), we stated the following concerning a circuit court's ruling on a motion for a change of venue:
"`"A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983)."
"`Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).'
"Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). `The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.' Slagle v. State, 606 So.2d 193, 195 (Ala. Crim.App.1992). `"Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial."' Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
"`In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated "actual prejudice" against him on the part of the jurors; 2) when there is "presumed prejudice" resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983).'
"Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994)."
Here, Blackmon argued that, based on the pretrial publicity and the alleged community saturation, the presumed-prejudice standard applied in this case. In Blanton we discussed the enormous burden that the presumed-prejudice standard imposes on a defendant. We stated:

*412 "For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
"`Hunt relies on the "presumed prejudice" standard announced in Rideau [v. Louisiana, 373 U.S. 723 (1963)], and applied by the United States Supreme Court in Estes [v. Texas, 381 U.S. 532 (1965),] and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: "Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"`In determining whether the "presumed prejudice" standard exists the trial court should look at "the totality of the surrounding facts." Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is "rarely" applicable, and is reserved for only "extreme situations". Coleman v. Kemp, 778 F.2d at 1537. "In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice." Coleman v. Kemp, 778 F.2d at 1490.
"`Hunt had the burden of showing that "prejudicial pretrial publicity" saturated the community. Sheppard, supra. "[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." Coleman v. Kemp, 778 F.2d at 1537. "Prejudicial" publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. "Publicity" and "prejudice" are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
"`....
"`... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, "the appellant must show more than the fact `that a case generates even widespread publicity.'" Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App. 1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
"`"`Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].'"

*413 "`Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala. 1977).'"
886 So.2d at 877-78.
We have reviewed the articles presented in support of the motion for a change of venue. The majority were factual accounts of the murder of the child and of Blackmon's arrest. There were several editorial articles that denounced Blackmon's actions; however, very little reference was made to her in those articles. Compared to other capital-murder cases, the publicity in this case was not extensive.
We have also reviewed the voir dire examination of the prospective jurors. Only a handful of the prospective jurors had heard about the case. The voir dire fails to support Blackmon's claim that the community was saturated with pretrial publicity of the murder. Clearly, Blackmon failed to meet her burden of showing that prejudice was presumed and that a change of venue was warranted. The circuit court correctly denied Blackmon's motion for a change of venue.

III.
Blackmon argues that the circuit court erred in denying her Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion. Specifically, Blackmon argues that the State erroneously removed five of the eight prospective black jurors on the jury venire and, she argues, the reasons given for striking the jurors were not sufficient. In her brief, Blackmon fails to identify any specific juror who was erroneously struck.
The record shows that Blackmon stated that her reason for the Batson objection was that the State removed five of the eight black prospective jurors on the jury venire.[2] The circuit court held that Blackmon failed to make a prima facie case of discrimination, but it nonetheless instructed the State to give its reasons for removing the black jurors.
"Although the trial court acknowledged that the appellant had failed to prove a prima facie case of racial discrimination based solely on these numbers, it nevertheless required the prosecutor to explain his reasons for his strikes. Therefore, we must examine the stated reasons. `[O]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.' Hernandez v. New York, 500 U.S. 352, 358-60, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)."
Dallas v. State, 711 So.2d 1101, 1104 (Ala. Crim.App.1997).
"`It is within the sound discretion of the trial court to determine if peremptory challenges of black jurors were motivated by intentional racial discrimination. The court's findings in this regard are afforded great deference and will not be reversed on appeal absent clear error. Ex parte Lynn, 543 So.2d 709 (Ala.1988).'"
Ex parte McNair, 653 So.2d 353, 357-58 (Ala. 1994), quoting Jelks v. Caputo, 607 So.2d 177, 179 (Ala.1992).
The State gave the following explanations for removing the black prospective *414 jurors: Juror number 17 was removed because she had expressed reservations about imposing the death penalty and because her son had been convicted of a felony. See Click v. State, 695 So.2d 209 (Ala.Crim.App.1996) (a juror's view on the death penalty is a valid race-neutral reason for striking the prospective juror); Lewis v. State, 741 So.2d 452 (Ala.Crim. App.1999) and Thomas v. State, 611 So.2d 416 (Ala.Crim.App.1992) (fact that family members have prior convictions is valid race-neutral reason for removing juror). Juror number 21 was removed because her son had been prosecuted in Houston County for burglary. Juror number 34 was struck because she knew Louise Johnson, Blackmon's mother-in-law, who was expected to testify. See Temmis v. State, 665 So.2d 953 (Ala.Crim.App.1994) (fact that prospective juror knows witness is valid race-neutral reason for removing the juror). Juror number 37 was struck because her sister-in-law was in prison for a shooting that occurred in 1998. Juror number 47 was struck because she knew Wayne Johnson, Blackmon's father-in-law, who was expected to testify. Juror number 58 was struck because she opposed the death penalty.[3]
As the above cited cases demonstrate we have upheld all of the reasons given by the State. The circuit court committed no error in denying Blackmon's Batson motion.

IV.
Blackmon argues that the trial court erred in denying her motion for a judgment of acquittal because "the State introduced no direct evidence that directly connected Blackmon to any of the alleged causes of death of the victim." She asserts that there was insufficient evidence that she committed any crime and that she was convicted on "mere conjecture, surmise and speculation."
This Court's duty when reviewing a claim on the denial of a motion for a judgment of acquittal is to determine whether there was legally sufficient evidence to support a conviction for the charged offense. See Marlowe v. State, 854 So.2d 1182 (Ala.Crim.App.2002). We review the evidence in a light most favorable to the State. Fitch v. State, 851 So.2d 103, 120 (Ala.Crim.App.2001). `"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So.2d 497, 498 (Ala. Crim.App.1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992).
"`Where a defendant's conviction is based solely on circumstantial evidence, `if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed.' Ex parte Brown, 499 So.2d 787, 788 (Ala.1986) (emphasis in original). `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 *415 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985). `It is not necessary for a conviction that the defendant be proved guilty to the "exclusion of every possibility of innocence."' Burks v. State, 117 Ala. 148, 23 So. 530 (1898). `The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.' Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895)."
"White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Accord Williams v. State, 795 So.2d 753, 775 (Ala.Crim. App.1999), aff'd, 795 So.2d 785 (Ala. 2001)."
Irvin v. State, 940 So.2d 331, 361-62 (Ala. Crim.App.2005).
"[B]ecause intent is a state of mind, it is rarely susceptible of direct or positive proof. Instead, the element of intent must usually be inferred from the facts testified to by the witnesses together with the circumstances as developed by the evidence. Seaton v. State, 645 So.2d 341, 343 (Ala.Crim.App.1994) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986)). Intent "`"may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances."'" Farrior v. State, 728 So.2d 691, 695 (Ala. Crim.App.1998) (quoting Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting, in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.1980)). Finally, "`[t]he intent of a defendant at the time of the offense is a jury question.'" C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App.2001), aff'd, 841 So.2d 292 (Ala.2002), quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993)."
Pilley v. State, 930 So.2d 550, 564-65 (Ala. Crim.App.2005).
Blackmon was indicted for capital murder under § 13A-5-40(a)(15), Ala.Code 1975. This section states: "The following [is a] capital offense [ ]: .... [m]urder when the victim is less than fourteen years of age."
"(a) A person commits the crime of murder if:
"(1) With intent to cause the death of another person, he causes the death of that person or of another person."
Section § 13A-6-2(a)(1), Ala.Code 1975.
The State's evidence showed that 28-month old Dominiqua Blackmon was bludgeoned to death with a pool cue. Dominiqua died of multiple blunt-force injuries. There was blood in numerous places in Blackmon's trailer. The blood matched Dominiqua's. Approximately two hours before the paramedics were called to Blackmon's mobile home, Dominiqua showed no sign of any injuries. Blackmon was the sole caretaker of the child during that period. The victim had an imprint of the sole of a shoe on her chest; that imprint matched the sole of the shoes Blackmon was wearing at the time of the murder.
Clearly, the evidence presented by the State was legally sufficient to present the matter of Blackmon's guilt to the jury for its determination. The circuit court committed *416 no error in denying Blackmon's motion for a judgment of acquittal.

V.
Blackmon argues that the circuit court erred in denying her motion for a new trial. She makes several different arguments in support of this claim.

A.
Blackmon first argues that "the selection of an age factor for alleged victims as a determining factor in liability for capital murder prosecution is arbitrary and capricious, lacking in rational basis." She asserts that § 13A-5-40(a)(15), Ala. Code 1975, which defines a capital offense as "[m]urder when the victim is less than fourteen years of age" violates her rights to due process and equal protection of the law.
In Ex parte Woodard, 631 So.2d 1065 (Ala.Crim.App.1993), this Court upheld the constitutionality of § 13A-5-40(a)(15), Ala. Code 1975. We stated:
"The child-murder provision is not arbitrary and does not violate any equal protection right.
"`"The Equal Protection Clause of the Fourteenth Amendment goes no further than to prohibit invidious discrimination.... If there is some reasonable basis for the recognition of separate classes, and if the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the Constitution is not offended. The transgression arises only when the classification rests upon grounds wholly irrelevant to achievement of the State's objective; the separate treatment must admit of but one conclusion beyond a rational doubt, i.e., that the basis therefore is arbitrary and unreasonable and without relevance to the legislative goal."'
"Goodson v. State, 588 So.2d 509, 514 (Ala.Cr.App.1991) (quoting State v. Thompson, 133 N.J.Super. 180, 336 A.2d 11, 14 (1975)). `"Because the statute does not proscribe activities that are legally protected and does not involve any legally cognizable `suspect' class, `the classification must be upheld if "any state of facts rationally justifying it is demonstrated to or perceived by the court."' United States v. Holland, 810 F.2d 1215, 1219 (D.C.Cir.), cert. denied, 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987)."' Hardy v. State, 576 So.2d 685, 686 (Ala.Cr.App.1991) (`"The legislature of Alabama `wanted to lessen the risk that drugs would be readily available to school children. It is surely rational to achieve that goal by increasing penalties for those who sell drugs near schools.'"'). Here, the classification adopted by the Legislature of child-murder as a capital offense is not arbitrary and capricious, but reasonable and appropriate.
"....
"It is the holding of this Court that Ala.Code 1975, § 13A-5-40(a)(15) is not unconstitutional."
631 So.2d at 1073. Other states have likewise upheld child-murder statutes against claims that there is no rational basis for distinguishing the victim's age when defining a capital offense. See State v. Higgins, 265 Conn. 35, 826 A.2d 1126 (2003) (upheld statute that defined capital murder as murder of child under the age of 16); Henderson v. State, 962 S.W.2d 544 (Tex. Crim.App.1997) (upheld statute that defined capital offense as murder of child under the age of 6). Cf. State v. Smith, 193 Ariz. 452, 974 P.2d 431 (1999) (upheld victim's age as statutory aggravating circumstance *417 to support imposition of death sentence).
For the reasons stated in Woodard, Blackmon's argument is without merit.

B.
Blackmon also makes several different arguments concerning the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
The United States Supreme Court in Apprendi held that a fact that increases a penalty above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court applied its earlier holding in Apprendi to death-penalty cases and stated "[c]apital defendants ... are entitled to a jury determination on any fact on which the legislature conditions an increased in their maximum punishment."[4]Ring, 536 U.S. at 589, 122 S.Ct. 2428.
Since the United States Supreme Court released its decision in Ring, this Court has had numerous occasions to discuss the impact of that case. In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to remand), we held that if the aggravating circumstance that elevated the punishment to death was also an element of the capital offense, Apprendi was not violated because the jury's verdict in the guilt phase found that fact to exist beyond a reasonable doubt. See also Barber v. State, 952 So.2d 393 (Ala.Crim.App. 2005); Pilley v. State, 930 So.2d 550 (Ala. Crim.App.2005); Flowers v. State, 922 So.2d 938 (Ala.Crim.App.2005); Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004); Jones v. State, 853 So.2d 1036 (Ala.Crim. App.2002).
Blackmon first argues that the holding in Apprendi renders Alabama's death-penalty statute unconstitutional because the jury's verdict is advisory. In Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002), we specifically held that "Ring did not invalidate Alabama's law that vests the ultimate sentence determination in the hands of the trial judge and not a jury." 924 So.2d at 785. We cited the United States Supreme Court's footnote in Ring, which stated: "Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty." Ring, 536 U.S. at 597, n. 4, 122 S.Ct. 2428. Also, in Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002), the Alabama Supreme Court stated:
"[T]he determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances."
859 So.2d at 1190.
Blackmon also argues that the decision in Apprendi mandates that a special verdict form be used so that the jury can designate what aggravating circumstance or circumstances it found to exist. We specifically addressed and rejected this argument in Bryant v. State, 951 So.2d 732, 737 (Ala.Crim.App.2003) (opinion on return to remand). We stated:
"[Bryant] contends that the United States Supreme Court's decisions in Apprendi and Ring mandate the use of such verdict forms.
"This Court has rejected similar claims in previous death-penalty decisions. *418 See, e.g., Walker v. State, 932 So.2d 140, 159 (Ala.Crim.App.2004); Adams v. State, 955 So.2d 1037, 1105 (Ala.Crim.App.2003). The Alabama Supreme Court has likewise rejected this argument. The Supreme Court has held, in numerous cases, that the jury's verdict finding a defendant guilty of capital murder during the guilt phase of his trial indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A-5-40(a), Ala.Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), cert. denied, 868 So.2d 1189 (Ala.2003). But see Ex parte McGriff, 908 So.2d 1024, 1039 (Ala. 2004) (authorizing prospective use of a penalty-phase special interrogatory).[[5]] Moreover, in Ex parte McNabb, 887 So.2d 998 (Ala.2004), the Supreme Court held that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed."
Bryant, 951 So.2d at 750-51.
In this case the only aggravating circumstance that was alleged and found to exist was that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5-49(8), Ala.Code 1975. This aggravating circumstance was not an element of the capital offense. However, the circuit court instructed the jury in the penalty phase that it could not proceed to a vote on whether to impose the death penalty unless it first determined that the aggravating circumstance that the offense was especially heinous, atrocious, or cruel was present. The circuit court's instructions in regard to this issue were very specific and thorough. The jury recommended, by a vote of 10 to 2, that Blackmon be sentenced to death.
"Thus, the jury's 10-2 vote recommending death established that the jury unanimously found the existence of the `especially heinous, atrocious, or cruel' aggravating circumstance, giving the trial judge the discretion to sentence Duke to death."
Duke v. State, 889 So.2d 1, 43 (Ala.Crim. App.2002) (footnote omitted), vacated on other grounds by Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), Duke v. Alabama, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005). Thus, there is no Apprendi or Ring violation in this case.

VI.
Blackmon argues that the circuit court erred in denying her motion challenging as unconstitutional her sentence of death by electrocution because the method of imposing the death sentence had been changed.
Blackmon was sentenced to death on June 7, 2002. The Alabama Legislature *419 enacted § 15-18-82.1, Ala.Code 1975, effective July 1, 2002. That statute specifically designates Alabama's method of execution as lethal injection. Blackmon argues that because the method of execution was changed after her sentence of death by electrocution was pronounced, her sentence of death by electrocution is unconstitutional.
Section § 15-18-82.1(a), Ala.Code 1975, effective July 1, 2002, provides: "A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution." This statute applies to every person on death row in Alabama no matter when his or her sentence of death was pronounced. As the legislature provided in 15-18-82.1(d):
"The provisions of the opinion and all points of law decided by the United States Supreme Court in Malloy v. South Carolina, 237 U.S. 180 (1915), finding that the Ex Post Facto Clause of the United States Constitution is not violated by a legislatively enacted change in the method of execution for a sentence of death validly imposed for previously committed capital murders, are adopted by the Legislature as the law of this state."
Alabama's change in its method of execution to lethal injection applies to Blackmon and renders this claim moot.

VII.
Blackmon argues that the State failed to prove that the murder was especially, heinous, atrocious, or cruel as compared to other capital murders. Specifically, he argues that the State failed to prove that the victim was conscious during any of her attack and that she suffered.
In Alabama, for the manner of homicide to meet the statutory definition of especially heinous, atrocious, or cruel, the murder must be unnecessarily torturous to the victim. See Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). In making this determination we consider whether the violence involved in the killing was beyond what was necessary to cause death, whether the victim experienced appreciable suffering after a swift assault, and whether there was psychological torture. See Norris v. State, 793 So.2d 847 (Ala. Crim.App.1999).
The circuit court, when considering whether to present this aggravating circumstance to the jury, stated:
"In Norris, the Court stated that the prosecution offered no evidence from which the Court could reasonably conclude that in that case [the victim] was conscious and aware after he was shot the first time. The only express mention of his state of consciousness was Henson's testimony that, in his telephone conversation to Norris after Herbert's funeral he told Norris that Herbert had never regained consciousness. The Court goes on to say, moreover, the prosecution presented no evidence that Herbert would have felt pain in the event he was unconscious. And then there's a note, Compare Brown v. State[, 663 So.2d 1028, 1034 (Ala.Crim.App. 1995)] in which the Court sated, especially heinous, atrocious, or cruel aggravating circumstance was supported by the medical examiner's testimony that, `although the victim was unconsciousness he still would have been able to feel pain.' Again, Dr. Parades testified to that in this situation. That there is some degree of feeling pain when one is comatose or unconscious. The blow to the skull causing death possible but not likely. Some injuries were inflicted while she was conscious. And that said injuries were painful."
*420 In the circuit court's order fixing Blackmon's sentence at death, the court made the following findings concerning this aggravating circumstance:
"The Court concurs with the jury's finding that this offense was especially heinous, atrocious and cruel when compared to other capital cases. Numerous physicians testified that approximately 30 fresh wounds were found on the body. One wound to the chest was so forceful as to leave the imprint of a sandal mark on the child's chest. Evidence also indicated that the child was beaten repeatedly with cue stick. The Defendant argued that the medical experts could not tell the precise order in which the injuries were inflicted nor could they state which injury caused the death of the child. They further argued that it was possible that the first blow killed the child and therefore she would not have experienced pain. However, Dr. Parades testified that bruising would not be caused when the heart is not pumping. He indicated there were over 30 external and internal injuries. The victim would have experienced a lot of pain during the beating. He further stated that the injuries were beyond that needed to cause death. There were pattern injuries that took more than one blow the victim would have been conscious during part of the assault. He further stated the injuries were severe and the pain associated with them would also be severe. While he could not tell the order in which the blows fell he believed that some of the injuries were inflicted while she was still conscious. Dr. Parades stated that it was possible that the blow to the skull could have caused unconsciousness but nonetheless even one who is comatose or unconscious feels some degree of pain. He further stated that the blow to the skull causing death was possible but not likely. He, however, could not tell how long she was alive.
"The Court is convinced beyond a reasonable doubt that this capital murder was heinous, atrocious and cruel when compared to other capital offenses. The Court concurs with the jury's finding."
Dr. Alfredo Parades testified at the penalty-phase hearing that Dominiqua had bruises all over her body and that a body will not normally bruise if the heart is not pumping. Parades said that all of the victim's injuries would have been painful, that they were extensivemore than necessary to cause deathand he believed, based on the extent of the injuries, that Dominiqua was conscious initially and then lost consciousness at some point during the attack.
Evidence also showed that Dominiqua vomited during the beating. The paramedics testified that Dominiqua was covered in vomit. Dominiqua's blood was also discovered in several areas of the trailer; she had no cloths but a diaper and socks on when she was discovered; and her socks were soaked in blood.
Clearly, there was sufficient evidence for the jury to conclude that the manner of death in this case was especially heinous, atrocious, or cruel when compared to other capital cases. We have consistently held that brutal beatings that result in death meet the statutory definition of especially heinous, atrocious, or cruel. See Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (1997); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000); Ashley v. State, 651 So.2d 1096 (Ala.Crim.App. 1994); McGahee v. State, 632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala. 1993); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988). Other states have also found that brutal beatings that result in death are especially heinous. See State *421 v. Gerlaugh, 135 Ariz. 89, 659 P.2d 642 (1983) (brutal beating lasting 15 minutes was sufficient to satisfy aggravating circumstance that the murder was committed in an especially heinous, cruel, or depraved manner); Scott v. State, 494 So.2d 1134, 1137 (Fla.1986) ("The brutal senseless beatings which the victim was forced to endure further set this crime apart form the norm of capital felonies and clearly reflect the conscienceless, pitiless and unnecessarily torturous nature of this crime."); State v. Sepulvado, 672 So.2d 158 (La.1996).
Blackmon brutally bludgeoned to death a helpless two-year old child using a pool cue and sometime during the beating stomped on her chest. By anyone's standards the murder in this case was especially heinous, atrocious, or cruel. This aggravating circumstance was correctly found by both the jury and the circuit court.

VIII.
Last, as required by § 13A-5-53, Ala.Code 1975, we review the propriety of Blackmon's conviction and sentence of death. Blackmon was indicted for, and convicted of, murdering her two-year-old daughter, a violation of § 13A-5-40(a)(15), Ala.Code 1975.
The record reflects that Blackmon's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1), Ala. Code 1975.
The circuit court's sentencing order reflects that the court found as the sole aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Section 13A-5-59(8), Ala.Code 1975. We detailed the circuit court's findings on this circumstance earlier in this opinion and found that this aggravating circumstance was correctly applied in this case. The circuit court found no statutory mitigating circumstance but found the following nonstatutory mitigating circumstances that had been presented by defense counsel:
"(1) Patricia Blackmon is a devoted wife. She may have been a devoted wife. However, her husband was in prison and did not testify. He would be in a better position to know if she was a devoted wife instead of other family members. Nonetheless, the Court considered this mitigating circumstance.
(2) Patricia Blackmon is a devoted daughter-in-law. Louise Johnson, the mother-in-law, testified to this fact. The Court also considers this mitigating circumstance.
"(3) The juvenile court of Houston County vested custody of Dominiqua Bryant in Patricia Blackmon. This mitigator was proved by the evidence and the Court will consider same.
"(4) The Houston County Department of Human Resources gave physical custody of Dominiqua to Patricia Blackmon. This mitigator was proved by the evidence and the Court will consider same.
"(5) Tammy Wigfall repeatedly used Patricia Blackmon as a caregiver for her children. The Court considers this mitigator.
"(6) Patricia Blackmon has been a positive influence in the Houston County Jail. The Court considers this mitigator.
"(7) Patricia Blackmon is a human being. This mitigator is axiomatic. All people are human beings. The Court considers this mitigator."
The circuit court weighed the aggravating circumstance and the mitigating circumstances, considered the jury's recommendation of death, and sentenced Blackmon to death.
Pursuant to § 13A-5-53(b)(2), Ala.Code 1975, we must independently weigh the *422 aggravating circumstances and the mitigating circumstances to determine the propriety of Blackmon's sentence of death. Blackmon, in a cold and brutal manner, bludgeoned her adopted two-year old daughter to death with a pool cue. This Court is convinced, after independently weighing the aggravating circumstance and the mitigating circumstances that death was the appropriate punishment in this case.
Neither was Blackmon's sentence disproportionate or excessive when compared to penalties imposed in similar cases. See Minor v. State, 914 So.2d 372 (Ala.Crim. App.2004); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988).
Last, we have searched the record for any error that may have adversely affected Blackmon's substantial rights and have found none. See Rule 45A, Ala.R.App.P.
Blackmon's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.

On Application for Rehearing
McMILLAN, Presiding Judge.
The appellant, Patricia Blackmon, was convicted of capital murder in the beating death of her 28-month-old daughter, Dominiqua. See § 13A-5-40(a)(15), Ala.Code 1975, which makes capital the intentional murder of a child under 14 years of age. The jury recommended that Blackmon be sentenced to death. The circuit court accepted the jury's recommendation.
On August 5, 2005, we affirmed Blackmon's conviction and death sentence in a 41-page opinion. See Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005). On the same date we released our decision in her case Blackmon's attorney was suspended from the practice of law. Blackmon was appointed new counsel and that attorney was allowed to withdraw when Blackmon retained another attorney. Because of the unique facts presented in this case we allowed newly retained counsel the rare opportunity of filing a brief on rehearing that raised new issues that had not been previously presented to this Court in Blackmon's original brief.[1] See Rule 2(a), Ala.R.App.P.
The State filed a petition for a writ of prohibition in the Alabama Supreme Court attacking this Court's acceptance of a new brief on rehearing. On December 16, 2005, the Alabama Supreme Court by order denied the State's petition for a writ of prohibition. State v. Blackmon [Ms. 1050175]. We now address Blackmon's claims raised for the first time in her rehearing brief.

I.
Blackmon argues that the State violated the United States Supreme Court's holding in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), because it used its peremptory strikes in a racially discriminatory manner.[2] *423 Specifically, she argues that the State failed to strike whites for the same reasons used to strike black prospective jurors; thus, she argues, there is evidence of disparate treatment of veniremembers in violation of Batson.
At trial, the only ground raised to support the Batson motion was the number of strikes the State had used to remove black potential jurors. This specific argument was not made to the circuit court; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
We have painstakingly reviewed the voir dire examination of the prospective jurors and the juror questionnaires that were completed by the jurors and forwarded to this Court. The State used 18 peremptory strikes to remove prospective jurors. Of those 18 strikes, the State struck 6 black prospective jurors; 2 black jurors sat on Blackmon's jury. Blackmon used all of her 18 strikes to remove white prospective jurors.
Our review of the record shows that the State exercised its strikes to remove the following prospective jurors:
1. Prospective juror number 89, a white male, who noted on his juror questionnaire that he had a felony conviction in the State of California and had served time in prison.
2. Prospective juror number 51, a white female, who indicated on her questionnaire that her son had been convicted of assault and had served time in prison.
3. Prospective juror number 58, a black female, who indicated during voir dire examination that she was opposed to the death penalty.
4. Prospective juror number 47, a black male, who indicated during voir dire that he knew one of the State's witness.
5. Prospective juror number 72, a white male, who indicated that he was not sure that he could sentence anyone to death.
6. Prospective juror 34, a black female, who indicated during voir dire that she knew a relative of the victim's.
7. Prospective juror 17, a black female, who indicated that she had reservations about the death penalty.
8. Prospective juror number 45, a white male, who indicated on his questionnaire that he had served on a prior jury and the jury had rendered a not-guilty verdict.
9. Prospective juror number 83, a white female, who indicated on her juror questionnaire that she could not truthfully state her view on the death penalty.
10. Prospective juror number 71, a white male, who indicated on his questionnaire that his sister had been raped.
11. Prospective juror number 65, a white male, who indicated on his questionnaire that he had been accused of a crime and who answered during voir dire that he would not be comfortable sitting on the case.
12. Prospective juror number 76, a white male, who indicated during voir dire that the movie "The Green Mile" had had an impact on how he views the death penalty.
13. Prospective juror number 63, a white male, who indicated on his juror questionnaire that he had previously *424 been on a jury on a rape case and the verdict had been not guilty.
14. Prospective juror number 28, a white female, who indicated that the movie "The Green Mile" had an impact on her view of the death penalty.
15. Prospective juror number 91, a white female, who indicated that her niece had been murdered.
16. Prospective juror number 21, a black female, who indicated that her son had been convicted of burglary.
17. Prospective juror number 37, a black female, who indicated that her sister-in-law was in prison for a shooting.
18. Prospective juror number 60, a white male who served as an alternate, who indicated on his questionnaire that he knew several members of the district attorney's office.
In Blackmon's brief on rehearing she cites four white prospective jurors who, she argues, were not removed even though they indicated that they had had involvement with law enforcement or that their family members had been involved with law enforcement. She specifically cites prospective jurors 24, 46, 57, and 73.
The record shows that prospective jurors number 24 and 57 were removed by Blackmon's use of her fifth and sixth peremptory strikes. Prospective juror number 46 indicated during voir dire that her nephew was involved in a case handled by the district attorney's office but that the case had not concluded. She also indicated that she had not seen her nephew in a long time and had little information about the pending case concerning her nephew. There is no more information in the record. Prospective juror number 73 indicated that she had been accused of neglect by the Department of Human Resources. However, she also indicated during voir dire that she had been treated fairly and that the matter had been resolved to her satisfaction.
The record also shows that white prospective jurors 89, 51, 65, were removed because of their involvement with the law or a family member's involvement with the law. It appears that every potential juror who indicated that they had been in prison or had a relative who had been or was in prison was removed. Prospective juror number 46 did not indicate that she had a relative who had been convicted of any crime.
The United States Supreme Court in Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), stated the following concerning the deference that we give a trial court's finding on a Batson motion:
"In Batson, we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal:
"`In a recent Title VII sex discrimination case, we stated that "a finding of intentional discrimination is a finding of fact" entitled to appropriate deference by a reviewing court. Anderson v. Bessemer City, 470 U.S. 564, 573[, 105 S.Ct. 1504, 84 L.Ed.2d 518] (1985). Since the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. Id., at 575-576.' Batson, supra, [476 U.S.,] at 98, n. 21.
". . . .
"Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context? because, as we noted in Batson, the finding 'largely will turn on evaluation of credibility.' 476 U.S., at 98, n. 21. In the typical peremptory challenge inquiry, *425 the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.' Wainwright v. Witt, 469 U.S. 412, 428[, 105 S.Ct. 844, 83 L.Ed.2d 841] (1985), citing Patton v. Yount, 467 U.S. 1025, 1038[, 104 S.Ct. 2885, 81 L.Ed.2d 847] (1984)."
500 U.S. at 364-65, 111 S.Ct. 1859 (emphasis added). "`A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous.'" Brown v. State, 982 So.2d 565, 587 (Ala.Crim.App. 2006), (quoting Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App.1996)). Based on our review of the record we cannot say that the circuit court's ruling was clearly erroneous.
Blackmon also argues that the State violated the United States Supreme Court's holding in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), by discriminating against jurors based on gender.
This issue is raised for the first time on rehearing; therefore, we review this issue for plain error. See Rule 45A, Ala. R.App.P.
As the Alabama Supreme Court stated in Ex parte Trawick, 698 So.2d 162 (Ala.1997):
"A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender."
698 So.2d at 167-68.
To find plain error in the context of a Batson or J.E.B. violation, the record must supply an inference that the prosecutor was "engaged in the practice of purposeful discrimination." Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987). Here, the record shows that the State struck nine males and nine females. The jury was composed of eight women and four men. There is no inference of purposeful *426 discrimination in violation of J.E.B. Accordingly, we find no plain error.

II.
Blackmon argues that the prosecutor committed reversible error by making a direct comment on Blackmon's failure to testify. Specifically, Blackmon challenges the following argument by the prosecutor in his closing argument in the guilt phase:
"She never did it. She never attempted to perform CPR. But, they want you to think that she did and she caused the injuries accidentally.
"We have not had a doctor yet that agreed with that. Wasn't a failed CPR attempt or trained doctors, board-certified, some specialists in forensic pathology said no. She is essentially dead on the floor. She has no pulse.... Not breathing. Pupils are fixed and dilated. Can't say clinical death because he is not a doctor. She is dead already because of what Ms. Blackmon did to her.
"You never heard anything else about anybody else being in there. Ms. Blackmon and Dominiqua. She didn't fall and hit her head once and end up in that condition. It just didn't happen."
(R. 1016-17.)
Initially, we observe that Blackmon never objected to the above-challenged comments. Therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
"`"This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful."' Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987)."
Johnson v. State, 823 So.2d 1, 45 (Ala. Crim.App.2001).
The Alabama Supreme Court has stated the following concerning a prosecutor's commenting on a defendant's failure to testify:
"Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt [v. State], [370 So.2d 736] at 739 [ (Ala.1979) ]; Ex parte Williams, 461 So.2d 852, 853 (Ala.1984); see Ex parte Purser, 607 So.2d 301 (Ala.1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the defendant's failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, [519] U.S. [933], 117 S.Ct. 308, 136 L.Ed.2d 224 (1996); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993); Ex parte Wilson, [571 So.2d 1251 (Ala. 1990) ]; Ex parte Tucker, 454 So.2d 552 (Ala.1984); Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975). Additionally, the Fifth and Fourteenth Amendments of the United States Constitution may be violated if the prosecutor comments upon the accused's silence. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Ex parte Land, supra; Ex parte Wilson, supra. Under federal law, a comment is improper if it was `"`manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'"' United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, *427 506 U.S. 927, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.
"Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, [375 So.2d 1231 (Ala. 1979) ]; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, `covert,' or indirect, comments are construed against the defendant, based upon the literal construction of Ala.Code 1975, § 12-21-220, which created the 'virtual identification doctrine.' Ex parte Yarber, 375 So.2d at 1234. Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra. A virtual identification will not exist where the prosecutor's comments were directed toward the fact that the State's evidence was uncontradicted, or had not been denied. See Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975); Ex parte Williams, supra; Ex parte Purser, supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.
"A challenged comment of a prosecutor made during closing arguments must be viewed in the context of the evidence presented in the case and the entire closing arguments made to the jury  both defense counsel's and the prosecutor's. Ex parte Land, supra; Windsor v. State, 683 So.2d 1021, 1023 (Ala.1994); Ex parte Musgrove, 638 So.2d 1360, 1368 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994). Here, defense counsel argued that the State's evidence, because of its circumstantial nature, was insufficient to prove beyond a reasonable doubt that the defendant had committed the crimes. Defense counsel insisted that the evidence created a reasonable hypothesis of the defendant's innocence because there were unidentified fingerprints, unidentified pubic hair, and unidentified semen at the crime scene, which, defense counsel contended, suggested that another person had committed the crimes. In rebuttal, the State commented upon the fact that defense counsel had not presented any evidence in support of this contention and had failed to contradict the State's evidence. The prosecutor highlighted the overwhelming evidence implicating the defendant as the perpetrator of the crimes and, in this context, argued that defense counsel's contention was hollow.
"Under the particular facts of this case, we cannot find that the prosecutor's statements were directed toward the defendant's silence. When viewed in the proper context, it is clear that they were a response to defense counsel's characterizing the circumstantial nature of the State's evidence in a way that *428 created a reasonable hypothesis of innocence. Ex parte Musgrove, 638 So.2d 1360 (Ala.1993); see Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); Merritt v. State, 571 So.2d 409 (Ala.Crim.App.1990); Ex parte McWilliams, 640 So.2d 1015, 1019-20 (Ala. 1993); Ex parte Wilson, 571 So.2d at 1262. The Court of Criminal Appeals correctly approved the trial court's ruling that the prosecutor had appropriately exercised his right to `reply in kind.' Ex parte Musgrove, 638 So.2d at 1369. We conclude that, in the context of the evidence and the closing arguments of both the defense and the State, the statements at issue were not a reference to the defendant's failure to testify, but rather were a reply to the insufficiency argument made by defense counsel that the evidence suggested a reasonable hypothesis of the defendant's innocence and that the State had failed to eliminate that hypothesis. Accordingly, we find no reversible error."
Ex parte Brooks, 695 So.2d 184, 188-90 (Ala.1997) (footnotes omitted).
Here, there was no direct comment on Blackmon's failure to testify. Blackmon's counsel at trial argued that Dominiqua's death could have been the result of improperly performed attempts to revive the victim. The prosecutor's comments were a response to that argument.

III.
Blackmon argues that the trial court's instructions regarding the jury's not being able to draw any adverse inference from Blackmon's failure to testify were erroneous and failed to comply with the United States Supreme Court's decision in Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981).
The record shows that Blackmon requested the following jury instruction:
"Patricia Blackmon has chosen not to testify in this case. Under the United States Constitution and the Alabama Constitution, Ms. Blackmon has the right to make that choice and I instruct you that you can draw no inference against her because she has chosen not to testify."
(C.R. 268.)
The circuit court gave the following instruction on Blackmon's decision not to testify:
"The defendant did not testify in her own behalf in this case. That must not and you cannot take that into consideration either for or against the defendant. The defendant has the right to either testify in her own behalf or to not testify in her own behalf. And, the fact that she did stay off the witness stand and does not testify cannot be taken and considered by the jury when it goes out to weigh and consider all of the testimony in this case and make up its verdict as to the guilt or innocence of the defendant."
(R. 1061.) The circuit court noted when denying the specific requested jury instruction that it would give an almost identical instruction and that there was no need to give the instruction twice.
On appeal, Blackmon argues, for the first time, that the jury instruction was not sufficient to comply with Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). She challenges the instruction given, which was virtually identical to the one she requested. "However, the appellant cannot request a jury instruction and then contend that the instruction was in error. The error in such a case is invited error. Phillips v. State, 527 So.2d 154 (Ala.1988)." Campbell v. *429 State, 654 So.2d 69, 72 (Ala.Crim.App. 1994).
Moreover, the Carter court did not comment on what constitutes a sufficient instruction on drawing no adverse inference from a defendant's failure to testify. When discussing the sufficiency of a no-adverse-inference instruction as it related to a requested jury instruction on the same subject, the United States Court of Appeals for the Tenth Circuit in United States v. Gomez-Olivas, 897 F.2d 500, 502 (10th Cir.1990), stated:
"In Carter [v. Kentucky, 450 U.S. 288 (1981),] the Supreme Court stated expressly that `a criminal trial judge must give a "no-adverse-inference" jury instruction' only `when requested by a defendant to do so.' 450 U.S. at 300, 101 S.Ct. at 1119; see also Coleman v. Brown, 802 F.2d 1227, 1234-35 (10th Cir.1986), cert. denied, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). We believe this principle also applies to the compulsion aspect of a no-adverse-inference instruction. Because the reference to compulsion underscores the fact that defendant is permitted to take the stand to testify, some defense counsel may not want the reference in the instruction. Cf. id. at 1235 (whether to request no-adverse-inference instruction is within attorney's tactical discretion). The trial judge is entitled to know when a defendant wants the compulsion aspect included in the instruction. Because defendant here did not request that the no-adverse-inference instruction contain a statement on compulsion, the trial court did not err in excluding it.
"At trial, defendant's only objection to the trial court's no-adverse-inference instruction was that it did not conform to the wording he requested. Of course, it is well settled that the form of jury instructions is a matter for the trial court's discretion, and the trial court need not give an instruction in the exact form and language requested. E.g., United States v. Gallup, 812 F.2d 1271, 1279 (10th Cir.1987). This principle is equally applicable to a no-adverse-inference instruction. See United States v. Ladd, 877 F.2d 1083, 1089 (1st Cir.1989); United States v. Russo, 796 F.2d 1443, 1454-55 (11th Cir.1986). The instruction in this case was adequate under the circumstances."
We find no plain error for the reasons discussed in Gomez-Olivas.

IV.
Blackmon next argues that it was reversible error for the circuit court to allow evidence that tests had been conducted on the victim's body looking for evidence of sexual assault. The following occurred during the testimony of Catherine K. McGeehan, a forensic biologist:
"Q [Prosecutor]: And, the slides and smears dealing, were you looking for blood and semen or essentially biological evidence of sexual assault? Correct?
"A [McGeehan]: The slides and smears indicate that there was no presence of semen or spermatozoa on those samples.
"The Court: All right. And, Gentlemen, I have now heard from several witnesses there has been some mention of negative or no evidence of sexual assault. This is not involved in this case, so let's just stay away from that. I see no relevance in this case. It was not, there is no evidence of it, so why are we wasting our time going into such evidence? Approach.
". . . .
"The Court: Why are you going into sexual assault? There has been no evidence from Dr. [Robert] Head [Dominiqua's pediatrician], from this *430 scientist; am I missing something here? Do you expect to show that somehow she was sexually assaulted?
"[Prosecutor]: No, sir. But, it is to show that she wasn't. I don't want to leave them open to say some mystery person came in.
"The Court: So, that is the reason for it?
"[Prosecutor]: Yes, sir. I am not trying to belabor the point, but trying to foreclose a possibility.
"The Court: If it were raised, you could bring the people back in rebuttal. But, I think we have heard enough and you don't need to spend much more time on a nonexistent semen and sexual assault. Won't y'all agree?
"[Defense counsel]: Your Honor, I have no position on that."
(R. 747-78.) (Emphasis added.) We note that if any error did occur it was invited by Blackmon's actions. See Campbell v. State, supra.
Moreover, a similar issue was addressed by this Court in Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), where we stated:
"The defendant also contends that there was error in the admission of oral, anal, and vaginal swabs taken from the victim where `there was not even the slightest suggestion in the evidence that the victim was touched in any way other than by gunshot.' ... At trial, defense counsel made no objection to any of this evidence.
"We fail to see the relevance of this evidence in this particular case. However, our review of the entire record shows that the prosecution did not take unfair advantage of either this evidence or the fingerprint evidence in an attempt to confuse the jury or in an effort to imply the inference of facts which did not exist. We do not find that the State attempted to use this evidence to bolster a weak case against the defendant. The admission of merely immaterial and not prejudicial evidence is not reversible error. See Gilley v. Denman, 185 Ala. 561, 567, 64 So. 97, 99 (1913). `It has long been the rule that the erroneous admission of evidence on an immaterial issue is harmless.' Forest Investment Corp. v. Commercial Credit Corp., 271 Ala. 8, 12, 122 So.2d 131 (1960). The admission of irrelevant evidence which could not have affected the verdict is not reversible error. Saunders v. Tuscumbia Roofing & Plumbing Co., 148 Ala. 519, 523, 41 So. 982, 984 (1906)."
577 So.2d at 511-12. For the reasons stated in Kuenzel, we find that if any error did occur, it was harmless.

V.
Blackmon argues that the circuit court improperly considered a nonstatutory aggravating circumstance when it sentenced Blackmon to death. Specifically, she argues that the circuit court erroneously considered as nonstatutory aggravating circumstances that the victim was adopted and that the victim had been abused. Blackmon relies on a comment made by the circuit court during the sentencing hearing before the court. After hearing arguments of counsel, the circuit court stated:
"But, maybe that is how it should be. Maybe the Court is a last resort from the impassioned pleas of attorneys, the passion of the jury verdict, because after all, as I indicated before, this is a court of law and not passion or emotion. It is hard not to be passionate or emotional about such a case. I will say this; that this Court has a natural aversion, a revulsion if you will, of sentencing a woman to death. At the same time, this *431 Court has a natural aversion or revulsion to what happened to this two and a half year old child. A child that was born into this world to a mother that would give her up. Given over by the State of Alabama to a woman who would take her life. I hope she is in a better place, because her life here on this earth, albeit was short, was pure hell.
"I say that because the evidence indicates that not only was the attack that took her life vicious, but there was a history of abuse to that child. There were numerous injuries on the child's body that were old. So, what can we tell from that for two and a half years she had been beaten repeatedly.
". . . .
"And, I thought in this case that were your client the natural mother of this child, that maybe life in prison without the possibility of parole would be the appropriate sentence so that every day of her life she might remember that child. But, in this situation she was not the biological mother of that child. This was a child whose life was just beginning. No one knows what she might have become."
(R. 1115-17.)[3]
In the circuit court's sentencing order the court stated:
"The law requires the trial court to enter specific findings concerning the existence or nonexistence of each aggravating circumstance enumerated by statute. The Court finds that the State proved beyond a reasonable doubt the existence of one aggravating circumstance:
"(1) The capital offense was particularly heinous, atrocious, and cruel when compared to other offenses...."
(C.R. 342-43.) (Emphasis added.) Again at the end of the sentencing order the circuit court stated: "When the Court weighs the aggravating circumstance against the mitigating circumstances in the manner the law requires, there can be little doubt that the aggravating circumstance far outweighs the mitigating circumstances." (Emphasis added.)
The circuit court's sentencing order reflects that it found and considered only one statutory aggravating circumstance  that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses. Clearly, the circuit court knew the law and correctly applied it.
"We presume that trial court judges know and follow the law. See Ex parte Slaton, 680 So.2d 909, 924 (Ala. 1996) ('Trial judges are presumed ... to know the law and to follow it in making their decisions.'); and Carter v. State, 627 So.2d 1027, 1028 (Ala.Crim.App.1992) (`A trial judge's actions are presumptively correct in the absence of a showing to the contrary.')."
Ex parte Atchley, 936 So.2d 513, 516 (Ala. 2006).

VI.
Blackmon argues that the circuit court erroneously found that the murder was especially heinous, atrocious, or cruel. We addressed this issue in depth in our original opinion and see no reason to reconsider our holding on rehearing.
However, as part of this issue Blackmon now argues that the aggravating *432 circumstance that the murder was especially heinous, atrocious, or cruel is unconstitutional because, she argues, it violates the Fifth, Eighth, and Fourteenth amendments to the United States Constitution.
Alabama courts have held to the contrary. As we have stated:
"With respect to Minor's constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance in § 13A-5-49(8), Ala.Code 1975, this Court has repeatedly upheld that circumstance against similar challenges. See Duke v. State, 889 So.2d 1 (Ala. Crim.App.2002); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App. 1999), aff'd, 776 So.2d 203 (Ala.2000); Bui v. State, 551 So.2d 1094 (Ala.Crim. App.1988), aff'd, 551 So.2d 1125 (Ala. 1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.1989)."
Minor v. State, 914 So.2d 372, 437 (Ala. Crim.App.2004).
Last, Blackmon now argues that the circuit court's instructions on this aggravating circumstance were erroneous. We have thoroughly reviewed the instructions on this aggravating circumstance. They were both thorough and accurate. Also, this Court has upheld instructions similar to those given in this case. See Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App. 2001).

VII.
Blackmon argues that her conviction violates the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The majority of Blackmon's arguments were addressed in our original opinion and will not be addressed again in this opinion.
In Apprendi, the United States Supreme Court held that a fact that increases a penalty above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. This holding was extended to death-penalty cases in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
Blackmon now argues that the jury instructions here violated Ring because the circuit court informed the jury that its verdict in the penalty phase was a recommendation. In Duke v. State, 889 So.2d 1, 43 (Ala.Crim.App.2002), we stated:
"Duke also argues that Ring requires penalty-phase relief when the jury is told that its verdict is `advisory' or merely a `recommendation.' Contrary to Duke's contention, Ring does not address the advisory nature of a jury's sentencing recommendation. Duke's jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala.Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)."
Blackmon also argues that her death sentence violates Ring because the jury was not instructed that it had to unanimously determine the existence of the aggravating circumstance and the weight that should be assigned to that aggravating circumstance. Again, in Duke we stated:
"We note that Ring requires only that the jury unanimously find the existence of an aggravating circumstance in order *433 to make the defendant death-eligible. Alabama law does not require that the jury's advisory verdict be unanimous before it can recommend death. See § 13A-5-46(f), Ala.Code 1975. Nothing in Ring supports Duke's claim the jury's advisory verdict be unanimous."
Duke, 889 So.2d at 43 n. 4.
Blackmon also argues that her conviction violates Apprendi and Ring because the aggravating circumstance relied on by the State was not alleged in the indictment. As this Court further stated in Duke:
"Duke also argues, in relation to the application of Ring, that his indictment was void because it failed to include in the indictment the aggravating circumstances the State intended to prove. This Court rejected a similar claim in Stallworth v. State, 868 So.2d [1128 (Ala. Crim.App.2001) ] (opinion on return to second remand). We stated:
"`In Poole v. State, 846 So.2d 370 (Ala.Crim.App.2001), we held that, although Apprendi [v. New Jersey, 530 U.S. 466 (2000)] required that the facts that increased a sentence above the statutory maximum must be submitted to a jury, those facts did not have to be alleged in the indictment. Recently, the Alabama Supreme Court adopted our holding in Poole. See Hale v. State, 848 So.2d 224 (Ala. 2002).
"`Also, the holdings, in Poole and Hale are consistent with prior caselaw, which holds that aggravating circumstances do not have to be alleged in the indictment. See Ex parte Lewis, 811 So.2d 485 (Ala.2001), and Dobard v. State, 435 So.2d 1338 (Ala. Crim.App.1982).'
"868 So.2d at 1186."
889 So.2d at 43. Blackmon is due no relief on any of her Ring claims.

VIII.
Blackmon argues that prosecutorial misconduct denied her a fair trial. She cites several instances of alleged misconduct in support of this contention. We note that there were no objections made to any of the alleged instances of misconduct. Therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
As this Court has stated:
"`In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. In doing so, we must evaluate the prosecutor's comments in the context of the entire trial. Duren v. State, 590 So.2d 360 (Ala.Crim. App.), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). The prosecution, as well as defense counsel, has the right to present its impressions from the evidence, and may argue every matter of legitimate inference that can be reasonably drawn from the evidence. Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982).'
"Ingram v. State, 779 So.2d 1225, 1251 (Ala.Cr.App.1999). Furthermore, when no objection is made to an allegedly improper argument, `"`[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'"' Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting in turn Johnson v. Wainwright, 778 *434 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987)."
Johnson v. State, 820 So.2d 842, 870 (Ala. Crim.App.2000).
Furthermore,
"[I]t `is not enough that the prosecutors' remarks were undesirable or even universally condemned.' Darden v. Wainwright, 699 F.2d [1031], at 1036 [ (11th Cir.1983) ]. The relevant question is whether the prosecutors' comments `so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Donnelly v. DeChristoforo, 416 U.S. 637 [94 S.Ct. 1868, 40 L.Ed.2d 431] (1974).'
Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
At the beginning of trial the circuit court gave an instruction concerning the comments made by the prosecutor and defense counsel. The circuit court instructed the jury:
"Ladies and Gentlemen, as I told you, the opening statements and closing arguments of the attorneys are intended to help you in understanding the evidence and applying the law. But, of course, what they say is not the evidence and not the law."
(R. 551.) We have examined each of the challenged remarks and find no evidence that any comment "so infected the trial with unfairness" that Blackmon's conviction was a denial of due process. See Darden v. Wainwright.

IX.
Blackmon next challenges several of the circuit court's jury instructions.
"`"In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that `an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.' Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998)."'
"Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim. App.1998). Moreover, `[w]hen reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).' Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000)."
Snyder v. State, 893 So.2d 488, 548 (Ala. Crim.App.2003).

A.
Blackmon argues that the circuit court's instructions on intent violated the Supreme Court's holding in Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
The circuit court's instruction on intent stated, in part:
"Intent, being a mental purpose or a state of mind, it is rarely, if ever, susceptible of direct proof. It is an inference to be drawn by the jury from the testimony of witnesses and facts in this case. A specific intent to kill is an essential ingredient of murder or capital murder as charged in this indictment. And, it may be inferred from the character of an assault or other attendant circumstances. Such intent may be inferred if the act is done deliberately and the death was reasonably to be apprehended *435 or expected as a natural and probable consequence of the act. But, the fact upon which such inference is drawn must be proved so clearly as to leave no reasonable doubt in the mind of a juror that on the occasion complained of, that the defendant intended to kill the deceased, Dominiqua Deshay Bryant.
"Now, as I indicated, the element of intent being a state of mind or mental purpose is usually incapable of direct proof and may be inferred from the character of the assault or other attendant circumstances from the nature and amount of force used in the fatal injury."
(R. 1053-54.) Blackmon argues that the circuit court's instruction created an irrebuttable presumption and impermissibly shifted the burden of proof to Blackmon.
"In Sandstrom [v. Montana, 442 U.S. 510 (1979)], the Supreme Court held that instructions which a reasonable jury could interpret as an `irrebuttable direction by the court to find intent' violate a defendant's due process rights. Sandstrom, 442 U.S. at 517, 99 S.Ct. at 2455-56. The complained-of instruction in Sandstrom was as follows: `[T]he law presumes that a person intends the ordinary consequences of his voluntary acts.' The instruction in Sandstrom created a 'mandatory presumption.'
"In DeRamus v. State, 565 So.2d 1167 (Ala.Cr.App.1990), the trial court gave a similar instruction to the jury as the one involved in the instant case. The instruction stated, `"[Intent] may be inferred from the character of the assault, the use of a deadly weapon or any other circumstances."' 565 So.2d at 1170. We stated that this instruction created a 'permissive inference,' and was not error.
"`"A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive reference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." Francis v. Franklin, 471 U.S. [307] at 314, 105 S.Ct. [1965] at 1971 [85 L.Ed.2d 344 (1985) ]. A permissive inference only violates the Due Process Clause "if the suggested conclusion is not one that reason and common sense justify in light of the facts before [the] jury." 471 U.S. at 314, 105 S.Ct. at 1971.'
"565 So.2d at 1170. The cited instruction in the instant case created a permissive inference. `The specific language cited by the appellant could not reasonably have been understood as creating a presumption which relieved the State of its burden of proof on the element of intent.' 565 So.2d at 1170."
Hart v. State, 612 So.2d 520, 529 (Ala. Crim.App.1992). See also McNabb v. State, 887 So.2d 929, 978-79 (Ala.Crim. App.2001).
We have reviewed the instruction in this case; the instruction created only a permissive presumption and not a irrebuttable or mandatory presumption. The jury instruction does not violate Sandstrom v. Montana, supra.

B.
Blackmon further argues that the circuit court's instructions on the jury's consideration of Blackmon's statements to police were erroneous. She cites Bush v. State, 523 So.2d 538 (Ala.Crim.App.1988), to support her argument.
The circuit court gave the following instruction:
"Ladies and gentlemen of the jury, the State has offered statements it contends *436 Patricia Blackmon made, and you heard, at the criminal investigation division. You have to determine what weight and credit you will give each statement and you may consider all of the circumstances surrounding the taking of that statement."
(R. 1063.)
As this Court stated in McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1999):
"The appellant cites Bush v. State, 523 So.2d 538, 560 (Ala.Cr.App.1988), and Ex parte Singleton, 465 So.2d 443, 446 (Ala.1985), to lend support to the principle that the trial court should have instructed the jury to consider the voluntariness of the confession; however, those cases addressed situations in which the trial court had informed the jury that it had already made a determination that the confession was voluntary and admissible, before the jury's evaluation of the statement; thus, the appellant's reliance on these cases is misplaced."
781 So.2d at 289.
When affirming a similar instruction in McWhorter, this Court noted that the instruction did not inform the jury that the court had already made a determination on the voluntariness of the defendant's statements to police. The same is true of the instruction given in this case. In fact, we have approved the use of substantially similar instructions in Gaddy v. State, 698 So.2d 1100, 1120 (Ala.Crim.App.1995).

C.
Blackmon next argues that the jury instructions on reasonable doubt were erroneous and violated the United States Supreme Court's decision in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because, she argues, the instructions diminished the State's burden of proof.
The circuit court gave the following instruction on reasonable doubt:
"The phrase reasonable doubt seems somewhat self-explanatory and efforts to define it do not always clarify the term. It is not a mere fanciful doubt because everything relating to human affair is open to some possible or imaginary doubt. A reasonable doubt is the doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all of the evidence in this case. It does not mean a vague or arbitrary notion, but it is an actual doubt based upon the evidence, lack of evidence, conflict in the evidence or combination thereof. It is a doubt that remains after going over in your mind the entire case and giving consideration to all the testimony. It is distinguished from a doubt arising from mere possibility, from bare imagination or fanciful conjecture. The doubt which would justify an acquittal must be a doubt from which you have a reason, arising from the evidence in part thereof or any lack of evidence and remaining after a careful consideration of the testimony such as reasonable and fair minded and conscientious men and women would entertain under all the circumstances. The State is not required to prove guilty beyond all doubt but beyond a reasonable doubt."
(R. 1048-49.)
The United States Supreme Court in Cage v. Louisiana, held that a trial court's instructions on reasonable doubt that contained the terms "moral certainty," "grave uncertainty," and "actual substantial doubt" were improper because they lessened the State's burden of proof. In Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), when revisiting its decision in Cage, the United States Supreme *437 Court held that use of some of the terminology condemned in Cage would not automatically mandate reversal if "`taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury.'" 511 U.S. at 22, 114 S.Ct. 1239 (quoting Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954)).
Here, the instructions were accurate and adequately defined reasonable doubt. The instructions did not violate Cage v. Louisiana, supra.

D.
Blackmon asserts that the circuit court's instructions on mitigating evidence violated Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), because the instructions failed to inform the jury that it need not unanimously agree on any mitigating circumstances.
The United States Supreme Court in Mills v. Maryland, held that if there was a substantial probability that jury instructions in the penalty phase implied that a finding on a mitigating circumstance must be unanimous, then the death sentence is due to be vacated.
In discussing the impact of Mills v. Maryland, this Court in Calhoun v. State, 932 So.2d 923, 972 (Ala.Crim.App. 2005), stated:
"As we stated in Tyson v. State, 784 So.2d 328 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000):
"`The appellate courts of this state have consistently held, since the United States Supreme Court's decision in Mills, that as long as there is no "reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances," there is no error in the trial court's instruction on mitigating circumstances. Freeman [v. State], 776 So.2d [160] at 195 [(Ala.Crim.App.1999)]. See also Ex parte Martin, 548 So.2d 496 (Ala. 1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Brown v. State, 686 So.2d 385 (Ala.Cr.App.1995); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994).'
"784 So.2d at 351.
"We have carefully reviewed the circuit court's jury instruction on mitigating circumstances and find no likelihood that the jury would have believed that its finding as to the existence of mitigating circumstances had to be unanimous. In fact, the instructions were similar to the pattern jury instructions. See Freeman v. State, 776 So.2d 160 (Ala.Crim. App. 1999), aff'd, 776 So.2d 203 (Ala. 2000)."
We, like this Court in Calhoun, have diligently reviewed the jury instructions on mitigating circumstances and find "no likelihood that the jury would have believed that its finding as to the existence of mitigating circumstances had to be unanimous." Calhoun, 932 So.2d at 972. There was no violation of Mills v. Maryland, supra.
Blackmon also argues that the jury instructions on mitigating circumstances were erroneous based on the Alabama Supreme Court's decision in Ex parte Bryant, 951 So.2d 724 (Ala.2002).
*438 In upholding instructions substantially similar to those given in the present case, the Alabama Supreme Court in Ex parte McNabb, 887 So.2d 998, 1004 (Ala.2004), stated:
"The charge in this case was not infected with the peculiar error present in Bryant, that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in Bryant that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error `seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,' Ex parte Davis, 718 So.2d [1166] at 1173-74 [(Ala.1998) ], so as to require a reversal of the sentence."
Based on the Supreme Court's rationale in McNabb, there was no error of the kind in the Supreme Court's decision in Bryant.
Blackmon also argues, as part of this issue, that the circuit court erred in refusing to give her instruction on mercy.
First, we note that Blackmon did not request a mercy instruction. The page number cited by Blackmon in her brief does not correspond with a requested mercy instruction. The only reference to mercy in Blackmon's requested jury instructions is this sentence: "A mitigating circumstance is anything about Patricia Blackmon or the crime which, in fairness and mercy, should be taken into account in deciding punishment." (C.R. 281.)
Moreover, we have held that a juror may not arbitrarily consider mercy when deciding whether a defendant should be sentenced to death or life imprisonment without the possibility of parole. As we stated in Stallworth v. State, 868 So.2d 1128, 1167 (Ala.Crim.App.2001):
"In Alabama, a capital jury cannot arbitrarily consider mercy in arriving at a sentence. As we stated in Gaddy v. State, 698 So.2d 1100, 1142 (Ala.Crim. App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997):
"`Because the requested charge by the appellant suggests that the jury recommend life without parole arbitrarily and based solely on mercy, the instruction was improper.
"`"The jury may not recommend mercy without reason. See Morrison v. State, 500 So.2d 36 (Ala.Cr. App.1985), aff'd, 500 So.2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). The jury does not have an 'unfettered option' to recommend a sentence of life without parole unless after weighing the aggravating and mitigating circumstances it finds that life without parole is warranted."
"`Williams v. State, 601 So.2d 1062, 1081 (Ala.Cr.App.1991). In Alabama, the jury must consider any relevant aggravating circumstances and mitigating circumstances, including any non-statutory mitigating circumstances introduced by the appellant that are relevant. The weight to be accorded the circumstances is a matter for the jury and the record indicates that the jury was properly instructed on how to weigh the circumstances....'
"The jury was instructed that it could consider anything in mitigation. The jury was also instructed that the aggravating *439 circumstances and the mitigating circumstances had to be weighed before considering whether a sentence was appropriate. The trial court's instructions were consistent with Alabama law."
In this case, the circuit court's instructions on mitigating circumstances stated, in part:
"Now, a mitigating circumstance does not have to be included in the list that I have read to you in order for it to be considered by you. In addition to the mitigating circumstances previously specified, mitigating circumstances shall include any aspect of a defendant's life, character, or record, and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.
"You must consider all evidence that is offered in mitigation. The weight you give to any particular mitigating circumstance is a matter for your moral and legal judgment."
(R. 107-08.) The jury instructions on mitigating circumstances were accurate and consistent with Alabama law. See Stallworth.

E.
Blackmon argues that the circuit court erred in failing to admonish the jury before each time it separated that the juror should not discuss the case among themselves. Specifically, she argues that the circuit court failed to comply with Rule 19.3, Ala.R.Crim.P.
Rule 19.3(b), Ala.R.Crim.P., states:
"(b) Admonitions to Jurors. In all cases, the court shall admonish the jurors that they are not:
"(1) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberations;
"(2) To converse with anyone else on any subject connected with the trial, until they are discharged as jurors in the case;
"(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
(4) To form or express any opinion on the case until it is submitted to them for deliberation.
"If the jurors are permitted to separate, they may also be admonished not to view the place where the offense was allegedly committed."
In this case the circuit court did not give detailed instructions each time that the jury separated; however, it did give detailed instructions to the jury before trial and at various intervals during the proceedings. Before trial, the circuit court gave the following instruction:
"I told you earlier, of course, that I am not going to sequester this jury. You will be allowed to go to your respective homes. The only stipulation there is, of course, is you cannot discuss this case in the evening with your spouses. And of course, you cannot review any news coverage, watch, read, listen to any media coverage concerning this case. And, while there has not yet been an address or location where these events allegedly occurred, there will be shortly. And, I am instructing that you can not go by there and make any independent examination of the scene. Because the law says it would be improper for you to do so. So, keep that in mind as we recess for lunch and as we recess for the evenings, that you will not be able to go by there.
"You heard me say repeatedly and you will again; do not discuss this case *440 among yourselves or allow anyone to discuss it with you. In fact, if anybody attempts to discuss it with you, you bring it to my attention immediately."
(R. 548.) At various other times in the record, the circuit court gave a similar instruction.
As we held in Smith v. State, 795 So.2d 788, 805 (Ala.Crim.App.2000):
"The trial court did not give similar detailed instructions at each break in the court proceedings. To require a court to do so would be unduly burdensome, disruptive, and contrary to the clear wording of Rule 19.3(d). Indeed, Rule 19.3(d) does not require that a trial court give the admonitions at each court break. Indeed, Rule 19.3(d) does not state that these instructions must be given more than once in the trial. The record clearly reflects that the jurors were aware of their duties and obligations. There was no violation of Rule 19.3(d)."

X.
Blackmon argues that the circuit erred in having ex parte communications with one of the State's expert witnesses. There was no objection to this alleged ex parte communication; therefore, we are limited to determining whether plain error exists. See Rule 45A, Ala.R.App.P.
We cannot agree with Blackmon's interpretation of what occurred. The record shows that during a hearing at which several motions were discussed, the following occurred:
"(Thereupon, a recess was called and taken by all parties. Upon completion of said recess, all parties returned to the presence and hearing of the court room and the following proceedings were had, to-wit:)
"The Court: On the record, out of the presence of the jury. Gentlemen, we have just addressed certain documentation from the Department of Forensic Sciences concerning audit material, accreditation material. I spoke with the Forensic Scien[tist]  her name is?
"[Prosecutor]: Phyllis Rollan.
"The Court: Ms. Rollan. She indicated that she would do everything in her power to get up with the appropriate parties to get certain documents here. We have addressed that situation and hopefully we will have that here in the morning at 8:30. What else is there?"
(R. 702.)
Clearly, the circuit court had no ex parte communications with Rollan. It appears that the court communicated with this witness at the behest of Blackmon and the State. There were no ex parte communications in this case. This claim is not supported by the record.

XI.
Blackmon next argues that the State failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Blackmon argues that the State failed to disclose evidence related to Dr. Alfredo Parades's qualifications. It asserts in brief: "The State initially indicated that `[a]s far as his release or retirement, there is none' and then indicated that it possessed `retirement papers' that were not disclosed to the defense." (Blackmon's brief at page 95.)
The following occurred:
"The Court: Are there any pending motions that we have not already addressed?
"[Defense counsel]: No, sir. We are just waiting for the information the *441 Court directed about Dr. Parades. But, other than that, there isn't any.
"[Prosecutor]: As far as his release or retirement, there is none.
"The Court: I am sorry?
"[Prosecutor]: There is no such information. If [defense counsel] would like to speak with Dr. Downs, he can confirm that for himself.
"[Defense counsel]: If Dr. Downs says so, there is no documentation.
"[Prosecutor]: Unless you want the retirement papers. He retired.
"The Court: Let me address a couple of items by way of housekeeping."
(R. 817.) The State did not withhold any exculpatory information but made the retirement papers available to the defense. We find no Brady violation.

XII.
Blackmon argues that the circuit court erred in failing to instruct the jury on the lesser-included offense of criminally negligent homicide.
The record shows that Blackmon did not request a jury charge on criminally negligent homicide. Therefore, we apply a plain-error standard of review. See Rule 45A, Ala.R.App.P.
Here, the circuit court gave jury instructions on the lesser-included offense of manslaughter. We have stated that
"`A defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position.' Ex parte Oliver, 518 So.2d 705, 706 (Ala. 1987). Section 13A-2-2(4), Code of Alabama 1975, states that `[a] person acts with criminal negligence ... when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists.'
"Thus, an instruction on criminally negligent homicide is correctly given only when reasonable evidence suggests that the appellant was unaware that he created a substantial and unjustifiable risk of death to another party. Wiggins v. State, 491 So.2d 1046 (Ala.Cr.App. 1986)."
Oddo v. State, 675 So.2d 58, 61-62 (Ala. Crim.App.1995).
The evidence indicated that Blackmon beat a two-year-old child to death with a pool cue and then stomped on her chest. There was absolutely no evidence presented indicating that Blackmon failed to "perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists." There was no rational basis for giving an instruction on criminally negligent homicide. The circuit court committed no error in failing to sua sponte instruct the jury on this lesser included offense.

XIII.
Blackmon argues that the circuit court erred in allowing evidence of prior bad acts. Specifically, she argues that it was error to admit evidence about old injuries the victim had suffered.
There was no objection to the admission of the evidence; therefore, we are limited to determining whether there is plain error. See Rule 45A, Ala.R.App.P.
Several doctors testified concerning the extent of the victim's injuries. In describing the injuries, the doctors referenced new and old injuries to clarify those injuries that had occurred when the victim was beaten to death. Blackmon argues that the references to old injuries implied that Blackmon had physically abused the victim before the beating that caused her death.
In this case, the evidence showed that the victim had been removed from her *442 natural mother's home and placed in Blackmon's custody approximately nine months before she was killed. The State never attributed the old injuries to Blackmon. In fact, after the defense had concluded its case, the following occurred:
"[Prosecutor]: This is one of the things you said approach about. I expect to call a rebuttal witness, a Ms. Reagan, who within the time frame he established with the DHR workers, my proffer would be Ms. Reagan saw Ms. Blackmon striking her child at the time Dominiqua would have been some eight months younger, while putting her very close to the time frame he established with DHR where she was switching her and screaming at her as she tried to get up the stairs. The lower steps, these were steps a small child would not have been capable of getting up. She was yelling at her and saying she was not getting up the stairs quick enough.
"The Court: [Defense counsel].
"[Defense counsel]: Yes, sir. First of all, I think [the prosecutor] said he proffered this testimony if there was evidence from us that Ms. Blackmon never switched Dominiqua. Which, at this time is contrary, your Honor. In Ms. Blackmon's statement, she admitted to having switched Dominiqua. That has been put in evidence here. So, we feel first of all, within the confines of the Court's ruling on the [Rule] 404B[, Ala. R.Evid.,] issue, we feel this is improper testimony and improper rebuttal.
"The Court: What does it rebut?
"[Prosecutor]: It rebuts testimony of Ms. Daniels and more recently Ms. Whatley. Everything was peaceful and nice and there was no problem whatsoever. There was problems and they let the child stay and yet a month later, she is wailing away on the child because she didn't get up the stairs quick enough.
"The Court: Well, the Court finds it would not be proper rebuttal. It is in the nature of prior bad acts."
(R. 991-92.)
The record shows that there was no evidence presented that indicated that Blackmon caused any of the victim's older injuries. Nor was this argued to the jury. Last, the only prior-bad-act evidence that the State attempted to present was deemed inadmissible by the circuit court. We find no error in this case.[4]

XIV.
Blackmon argues that the circuit court erred in failing to give a residual-doubt instruction. He argues that the United States Supreme Court has recently granted certiorari on a case involving the issue whether a defendant has a right to a residual-doubt instruction in the penalty phase of a capital trial. He contends that we should hold this case in abeyance until the Supreme Court resolves this issue.
However, the case referenced by Blackmon has now been released by the United States Supreme Court. See Oregon v. Guzek, 546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006). In Oregon v. Guzek, the Supreme Court considered the validity of an Oregon Supreme Court's decision that held that the United States Constitution provided a right to introduce alibi evidence at the penalty phase of a capital trial. In reversing the lower court's decision, the United States Supreme Court stated:
"[S]ubsequent to Green [v. Georgia, 442 U.S. 95 [99 S.Ct. 2150, 60 L.Ed.2d 738] (1979) ], this Court decided Franklin v. *443 Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion), and that case makes clear, contrary to the Oregon Supreme Court's understanding, that this Court's previous cases had not interpreted the Eighth Amendment as providing a capital defendant the right to introduce at sentencing evidence designed to cast `residual doubt' on his guilt of the basic crime of conviction. The Franklin plurality said it was `quite doubtful' that any such right existed. Id., at 173, n. 6, 108 S.Ct. 2320. And two other Members of the Court added that `[o]ur cases' do not support any such `right to reconsideration by the sentencing body of lingering doubts about ... guilt.' Id., at 187, 108 S.Ct. 2320 (O'Connor, J., concurring in judgment). See also Penry v. Lynaugh, 492 U.S. 302, 320, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (characterizing Franklin as a case in which a majority 'agreed that "residual doubt" as to Franklin's guilt was not a constitutionally mandated mitigating factor' (brackets omitted)).
"Franklin did not resolve whether the Eighth Amendment affords capital defendants such a right, for the plurality held that the sentencing scheme at issue was constitutional `even if such a right existed.' 487 U.S., at 174, 108 S.Ct. 2320. But the Court's statements on the matter make clear that the Oregon Supreme Court erred in interpreting Green as providing a capital defendant with a constitutional right to introduce residual doubt evidence at sentencing.
"In this case, we once again face a situation where we need not resolve whether such a right exists, for, even if it does, it could not extend so far as to provide this defendant with a right to introduce the evidence at issue. See, e.g., Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461-462, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945). The Eighth Amendment insists upon `"reliability in the determination that death is the appropriate punishment in a specific case."' Penry, supra, at 328, 109 S.Ct. 2934 (quoting Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion)). The Eighth Amendment also insists that a sentencing jury be able `to consider and give effect to mitigating evidence' about the defendant's `character or record or the circumstances of the offense.' Penry, supra, at 327-328, 109 S.Ct. 2934. But the Eighth Amendment does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted. Rather, `States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty."' Boyde v. California, 494 U.S. 370, 377, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (quoting Franklin, supra, at 181, 108 S.Ct. 2320 (plurality opinion)); see, e.g., Johnson v. Texas, 509 U.S. 350, 362, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); California v. Brown, 479 U.S. 538, 543, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)."
546 U.S. at 525-26, 126 S.Ct. at 1231-32.
Alabama has consistently held that a capital defendant is not entitled to a jury instruction on residual doubt in the penalty phase. See Benjamin v. State, 940 So.2d 371, 382-83 (Ala.Crim.App.2005), Myers v. State, 699 So.2d 1281, 1283-84 (Ala.Crim. App.1996); Harris v. State, 632 So.2d 503, 535 (Ala.Crim.App. 1992). The United States Supreme Court's decision in Oregon v. Guzek is consistent with our prior decisions. The circuit court committed no error in denying Blackmon's request for a *444 residual-doubt instruction in the penalty phase.

XV.
Blackmon argues that the circuit court erroneously allowed DNA evidence to be introduced when there was no evidence that it was reliable. Specifically, she argues that the State failed to comply with the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Turner v. State, 746 So.2d 355 (Ala.1998), because the State failed to prove the reliability of the testing and the population-frequency statistics.
The Alabama Supreme Court in Turner set out the guidelines for the admission of DNA evidence. The court stated:
"[I]f the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to § 36-18-30[, Ala. Code 1975], determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
"I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based `reliable'?
"II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based `relevant' to understanding the evidence or to determining a fact in issue?
"Trial courts should use the flexible Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),] analysis in making the `reliability' (scientific validity) assessment. In making that assessment, the courts should employ the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance.
"Trial courts should make the `relevance' assessment by addressing the `fit' between what the scientific theory and technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible.
"Of course, once a particular theory or technique has satisfied § 36-18-30, a court may take judicial notice of that theory or technique's reliability. See [Ex parte] Perry, 586 So.2d [242] at 251 [(Ala.1991) ]; [United States v.] Beasley, 102 F.3d [1440] at 1448 [ (8th Cir. 1996)] (holding that reliability of the polymerase chain reaction ('PCR') method of DNA typing would be subject to judicial notice in future cases); [United States v.] Martinez, 3 F.3d [1191] at 1197 [ (8th Cir.1993) ] (holding that the reliability of the restriction fragment length polymorphism ('RFLP') procedure was subject to judicial notice). We recognize that the state of scientific theories and the techniques for producing DNA evidence is not static, and that the scientific community undoubtedly will produce new theories and techniques regarding DNA. Each new theory and technique will be subject to the test set out above until its reliability warrants judicial notice."
746 So.2d at 361-62 (footnotes omitted).
In this case, the circuit court held a hearing outside the presence of the jury on the admission of the DNA evidence. Phyllis *445 T. Rollan, a forensic biologist at the Alabama Department of Forensic Sciences, testified concerning the DNA tests conducted in this case. Rollan testified that the laboratory uses the polymerase chain-reaction ("PCR") method of DNA testing. She testified that the procedure is generally accepted in the scientific community, that it is reliable, and that quality controls are in place to ensure the test's accuracy. She testified that Alabama had established a database for population-frequency statistics and it was consistent with other established databases throughout the county. The calculations are done using a computer and then two scientists review the DNA profile. Rollan also stated that the statistical information is generally accepted in the scientific community. Rollan last testified that she followed all of the procedures that are generally accepted in the scientific community in this case and that the controls did not indicate that any error had occurred.
Here, it is clear that the State complied with the Daubert requirements. The circuit court committed no error in admitting the DNA evidence.

XVI.
Blackmon argues that the State's experts were improperly permitted to testify based on evidence not introduced at trial. Specifically, she asserts that Dr. James Downs was allowed to give his expert opinion on the victim's injuries and her death, but he never viewed the victim's body; moreover, he relied exclusively on photographs, diagrams, and observations made by Dr. Alfredo Paredes.
Rule 703, Ala.R.Evid., provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." The Advisory Committee's Notes to this Rule also provide: "This includes data presented to the expert by means other than personal perception, such as through the opinions, records, or reports of others."
As the Alabama Supreme Court has stated: "It is well settled that any challenge to the facts upon which an expert bases his opinion goes to the weight, rather than the admissibility, of the evidence. Dyer v. Traeger, 357 So.2d 328, 330 (Ala.1978)." Baker v. Edgar, 472 So.2d 968, 970 (Ala. 1985). The circuit court committed no error in allowing the experts to testify.

XVII.
Blackmon argues that the circuit court erred in admitting cumulative evidence concerning the victim's injuries.
Initially, we note that there was no objection to this testimony, therefore, we review the issue for plain error. See Rule 45A, Ala.R.App.P.
Even if we were to conclude that the circuit court erred, we would find no reason to reverse this case. We have frequently stated that: "The erroneous admission of evidence that is merely cumulative is harmless error." Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App. 1995). See also Yeomans v. State, 641 So.2d 1269 (Ala.Crim.App.1993); McFarley v. State, 608 So.2d 430 (Ala.Crim. App.1992).
Moreover, it was Blackmon's contention that the injuries were caused by improperly performed attempts to revive the victim. Thus, the extent and cause of the victim's injuries was a highly contested issue. The circuit court committed no error in allowing cumulative testimony concerning the victim's injuries.

*446 XVIII.
Blackmon argues that the circuit court erred in admitting hearsay evidence during Dr. Alfredo Paredes's testimony. Specifically, she argues that the court erred in allowing Dr. Paredes to read from a report he had prepared. Blackmon argues in brief: "Because Ms. Blackmon did not have an opportunity to confront these out-of-court statements offered for their truth, their introduction was highly prejudicial and corrupted the fairness of the trial process." (Blackmon's rehearing brief at page 114.)
There was no objection to Dr. Parades's testimony; therefore, we review this issue for plain error. See Rule 45A, Ala. R.App.P.
The following occurred during Dr. Parades's testimony:
"Q [Prosecutor]: In your final anatomical diagnosis near the front of the report 
"A [Dr. Paredes]: Uh-huh. (Affirmative response.)
"Q: What I would like to do is go through that list and explain what each thing means.
"A: Okay.
"Q: Start with capital letter A and tell the ladies and gentlemen what the finding was.
"A: Let me read what I describe as being under capital letter A. Multiple punctate, meaning like pinpoint, linear, like a line, well healed hypo-pigmented, hypo meaning less pigmentation than normal, scars over the face, the front part of the neck, upper abdomen, left forearm, dorsum of the right arm, means the fat of the right arm, arm and forearm, the front part of the right thigh, the left lower leg and the back of the left lower leg. These were, again, multiple scars which I considered to be associated with previous injuries. They were multiple, they were pinpoint, they were linear. The scars are not associated, in my opinion, with accidental injuries because of the particular locations, particularly the back of the leg, the front part of the neck."
(R. 862-63.)
As we stated in Williams v. State, 627 So.2d 985, 990 (Ala.Crim.App.1991):
"`The defendant's Sixth Amendment right of confrontation ... limits the prosecution's use of statements of persons who do not testify at trial and therefore cannot be cross-examined. Such statements, when offered for their truth, ordinarily constitute hearsay.... The crucial question under the confrontation clause is not compliance with common law hearsay rules, but fulfillment of the "mission of the confrontation clause to advance the accuracy of the truth determining process ... by assuring that the trier of fact has a satisfactory basis for evaluating the truth of a prior statement."'
"LaFave, Criminal Procedure § 23.3(d) (1984). (Emphasis added [in Williams ].) ... [T]he crucial ingredient necessary to activate the confrontation clause when hearsay is involved is the presence of a `statement made by a person who does not testify at trial.' See LaFave, supra."
The Confrontation Clause was not implicated in this case because Dr. Paredes, the author of the report, was in court and subject to cross-examination. Blackmon was not denied her right to confront Dr. Paredes.

XIX.
Blackmon argues that her sentence of death is grossly disproportionate to the crime. Specifically, she argues: "Nothing *447 about the way in which the victim died, the scene of the crime, or the facts surrounding Ms. Blackmon's activities that day suggests that Ms. Blackmon intentionally killed her child." (Blackmon's rehearing brief at page 116.) Blackmon further argues that each year there are 300 homicides involving parents who kill their children and only a small percentage of those parents are sentenced to death. She further argues that the death penalty is disproportionately used against women in domestic-violence cases.
In our previous opinion we found that Blackmon's death sentence was not disproportionate. We have been cited no reason to revisit our holding.

XX.
Blackmon argues that her right to a speedy trial was violated because of the 35-month delay between her arrest and her trial.
In this case, Dominiqua was murdered on May 29, 1999. Blackmon was arrested on June 1, 1999. Blackmon was indicted in August 1999 for capital murder. In June 2000, the State informed the court that it was awaiting test results from the Department of Forensic Sciences and was not ready to proceed with trial. In May 2001, Blackmon moved for a speedy trial. In August 2001, the circuit court directed the Department of Forensic Sciences to complete the blood tests and have the results for a January 2002 trial date. On January 2, 2002, Blackmon requested a continuance. On January 10, 2002, the case was continued by agreement of both parties. On January 16, 2002, Blackmon requested another continuance. Blackmon then moved that the case be stayed pending the United States Supreme Court's ruling in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). That motion was denied. In February 2002, the circuit court ex mero motu moved the trial date from March 2002 to April 2002. Blackmon's trial started on April 18, 2002.
As the Alabama Supreme Court stated in Ex parte Walker, 928 So.2d 259, 263 (Ala.2005):
"An accused's right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and by Art. I, § 6, of the Alabama Constitution, 1901. As noted, an evaluation of an accused's speedy-trial claim requires us to balance the four factors the United States Supreme Court set forth in Barker [v. Wingo, 407 U.S. 514 (1972)]: `[l]ength of delay, the reason for the delay, the defendant's assertion of [her] right, and prejudice to the defendant.' 407 U.S. at 530, 92 S.Ct. 2182 (footnote omitted). See also Ex parte Carrell, 565 So.2d [104] at 105 [ (Ala.1990) ]. `A single factor is not necessarily determinative, because this is a "balancing test, in which the conduct of both the prosecution and the defense are weighed."' Ex parte Clopton, 656 So.2d [1243] at 1245 [(Ala. 1995) ] (quoting Barker, 407 U.S. at 530, 92 S.Ct. 2182). We examine each factor in turn."
(Footnotes omitted.)
Length of delay. When examining the length of the delay we apply the law as set out by the Alabama Supreme Court in Ex parte Walker:
"In Doggett v. United States, the United States Supreme Court explained that the first factor  length of delay  `is actually a double enquiry.' 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The first inquiry under this factor is whether the length of the delay is `"presumptively prejudicial."' 505 U.S. at 652, 112 S.Ct. 2686 (quoting Barker, 407 U.S. at 530-31, 92 S.Ct. 2182). A finding that the length of delay is presumptively *448 prejudicial `triggers' an examination of the remaining three Barker factors. 505 U.S. at 652 n. 1, 112 S.Ct. 2686 ('[A]s the term is used in this threshold context, "presumptive prejudice" does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker enquiry.'). See also Roberson v. State, 864 So.2d 379, 394 (Ala.Crim.App.2002).
"In Alabama, `[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant  whichever is earlier  to the date of the trial.' Roberson, 864 So.2d at 394. Cf. § 15-3-7, Ala.Code 1975 ('A prosecution may be commenced within the meaning of this chapter by finding an indictment, the issuing of a warrant or by binding over the offender.'); Rule 2.1, Ala. R.Crim. P. ('All criminal proceedings shall be commenced either by indictment or by complaint.'). The length of the delay in this case was approximately 50 months: Walker was indicted on January 14, 2000, and she pleaded guilty on March 25, 2004. See Carrell, 565 So.2d at 107 (calculating the length of delay from defendant's indictment until his plea of guilty). The State concedes (and both the trial court and the Court of Criminal Appeals held) that the 50-month delay in Walker's case was presumptively prejudicial."
928 So.2d at 263-64 (footnotes omitted). Here, there is no question that the delay was presumptively prejudicial. Thus, we must examine the remaining factors discussed in Barker v. Wingo.
Reasons for the delay. It appears that a good portion of the delays were based on motions filed by Blackmon. The delay attributable to the State was the delay concerning the results of the forensic tests. "Justified delay  which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible  is not weighted against the State. Barker, 407 U.S. at 531, 92 S.Ct. 2182." Walker, 928 So.2d at 265.
Assertion of right to speedy trial. Blackmon did not file a motion for a speedy trial until May 2001  11 months before she was tried.
"An accused does not waive the right to a speedy trial simply by failing to assert it. Barker, 407 U.S. at 528, 92 S.Ct. 2182. Even so, courts applying the Barker factors are to consider in the weighing process whether and when the accused asserts the right to a speedy trial, 407 U.S. at 528-29, 92 S.Ct. 2182, and not every assertion of the right to a speedy trial is weighted equally. Compare Kelley v. State, 568 So.2d 405, 410 (Ala.Crim.App.1990) ('Repeated requests for a speedy trial weigh heavily in favor of an accused.'), with Clancy v. State, 886 So.2d 166, 172 (Ala.Crim.App.2003) (weighting third factor against an accused who asserted his right to a speedy trial two weeks before trial, and stating: `"The fact that the appellant did not assert his right to a speedy trial sooner 'tends to suggest that he either acquiesced in the delays or suffered only minimal prejudice prior to that date.'"') (quoting Benefield v. State, 726 So.2d 286, 291 (Ala.Crim.App.1997), additional citations omitted), and Brown v. State, 392 So.2d 1248, 1254 (Ala.Crim.App. 1980) (no speedy-trial violation where defendant asserted his right to a speedy trial three days before trial)."
Ex parte Walker, 928 So.2d at 265-66.
Prejudice to the defendant. Blackmon does not assert in brief nor did she assert at trial how she was specifically prejudiced by the delay in her trial. "Walker ... has *449 neither alleged nor proved how the delay actually impaired her defense, and both the trial court and the Court of Criminal Appeals rejected Walker's speedy-trial claim because of her failure to establish actual prejudice." Ex parte Walker, 928 So.2d at 259.
After reviewing the Barker v. Wingo factors, we find no evidence that Blackmon was denied her constitutional right to a speedy trial.

XXI.
Blackmon argues that the circuit court erred in denying her motion for a change of venue. This issue was extensively addressed in our original opinion and we found that the circuit court did not err in denying Blackmon's motion for a change of venue. We see no reason to revisit that issue on rehearing.

XXII.
Blackmon argues that the circuit court erred in denying her motion for a judgment of acquittal. We addressed this issue in our original opinion and found that the evidence was more than sufficient to present to the jury for its determination. There is no reason to change that holding on rehearing.

XXIII.
Blackmon argues that the circuit court erred in denying her motion for a new trial. This issue was thoroughly addressed in our original opinion. We held that the circuit court did not err. We have been cited nothing that would give us reason to revisit that holding on rehearing.

XXIV.
Blackmon argues the circuit court erred in admitting photographs of the victim's body and her injuries because they were inflammatory, repetitive, and prejudicial.
There was no objection at trial; therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
"Alabama courts have held on many occasions that photographs of the crime scene and the victims are admissible, even though they might be gruesome and cumulative, if they shed light on an issue being tried. E.g., Baird v. State, 849 So.2d 223, 246 (Ala.Crim.App.2002)." McGahee v. State, 885 So.2d 191, 214 (Ala. Crim.App.2003). The photographs were correctly received into evidence.

XXV.
Blackmon argues that her statements were involuntary and should not have been admitted into evidence.
This claim was not presented to the circuit court; therefore, we review this issue for plain error. See Rule 45A, Ala. R.App.P.
When reviewing the voluntariness of a confession we apply the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
"For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App. 1984)....
"The Fifth Amendment to the Constitution of the United States provides in pertinent part: `No person ... shall be compelled in any criminal case to be a witness against himself....' Similarly, *450 § 6 of the Alabama Constitution of 1901 provides that `in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.' These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim. App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added)."
718 So.2d at 729 (footnote omitted).
The uncontested evidence showed that Sgt. Doug Johnson read Blackmon her Miranda rights and that she signed a waiver of rights form. She also indicated on the form that she was not pressured or promised anything in order to secure her statements. There was absolutely no evidence presented indicating that Blackmon's statements were not voluntarily given. The circuit court committed no error in admitting her statements into evidence.

XXVI.
Blackmon argues that the circuit court improperly denied her motion in limine to prevent the State from impeaching a defense witness with an uncharged accusation of child neglect.
When this issue was raised before the defense's case-in-chief the circuit court stated the following:
"The State is instructed not to go into that until it approaches the Court out of the presence of the jury and to bring it up at that time. I tend to agree with [defense counsel] that it would not generally be admissible. However, I could foresee situations where it might rise to that level of admissibility, if you were to *451 open the door on it somehow.... So, you know, I don't want to foreclose possibilities where it might be admissible and just give an iron clad ruling presently.
"But again, the State is instructed not to go into it unless and until such time that it becomes an issue. Until such time as it arguably could be admissible and then the State would have to approach the bench out of the presence of the jury and bring it up at that time."
(R. 963.) Clearly, there was no adverse ruling. The circuit court agreed with the defense and this issue was not brought up again during this witness's testimony. Blackmon's assertion is not supported by the record.

XXVII.
Blackmon argues, in one paragraph in her rehearing brief, that she was denied a full appeal because the record of the proceedings in circuit court was not fully transcribed. She asserts that parts of discovery, bench conferences, witness testimony, and jury questionnaires were omitted from the record.
This claim is raised for the first time on appeal and will be reviewed for plain error. See Rule 45A, Ala.R.App.P.
Initially we note that juror questionnaires are to be omitted from the record unless we specifically direct that they be forwarded to this Court. See Rule 10(a)(6), Ala.R.App.P. This Court requested that the circuit clerk forward those questionnaires to this Court.
Furthermore, as we stated in Wynn v. State, 804 So.2d 1122, 1143-44 (Ala.Crim. App.2000):
"[I]t should have been apparent to the defense during the trial that the court reporter was not recording certain sidebars.... Defense counsel could have easily reminded the trial court that it had granted his motion for full recordation of the proceedings and remedied the omissions at that time. Therefore, this error was invited by the appellant."
Moreover, one of Blackmon's appellate attorneys was also one of Blackmon's trial attorneys. When an appellant has the same lawyer on appeal and at trial the appellant must show that the failure to transcribe the complete record resulted in prejudice to him  there is no per se prejudice rule. See Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999).
Blackmon has made no argument as to how she was prejudiced by the omission of what appears to be minor portions of the record. It is apparent, after reviewing the pages cited by Blackmon, that the omissions related to scheduling concerns. There is no reversible error here.

XXVIII.
Blackmon argues that "death qualifying" the jury produced a conviction-prone jury and, she argues, denied her of her right to an impartial jury.
This claim was not raised at trial; therefore, we review this issue only for plain error. See Rule 45A, Ala.R.App.P.
The United States Supreme Court in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), held that the United States Constitution does not forbid a capital defendant's potential jury from being "death qualified" and that to do so does not deprive a defendant of his constitutional right to an impartial jury. 476 U.S. at 173, 106 S.Ct. 1758. Alabama has followed the holding in Lockhart v. McCree. See Johnson v. State, 823 So.2d 1 (Ala.Crim.App.2001); Clemons v. State, 720 So.2d 961 (Ala.Crim.App.1996).

*452 XXIX.
Blackmon last argues that the circuit court erred in not allowing discovery of the grand-jury materials. We addressed this issue in our original opinion and held that there was no error. We have been cited no reason to reevaluate our holding on rehearing.
In our original opinion we reviewed the propriety of Blackmon's death sentence and found no violation of § 13A-5-53, Ala. Code 1975; nor did we find any plain error. See Rule 45A, Ala.R.App.P.
For the foregoing reasons, Blackmon's application for rehearing is due to be, and is hereby, overruled.
APPLICATION OVERRULED.
COBB, BASCHAB, and SHAW, JJ., concur.
WISE, J., concurs specially, with opinion.
WISE, Judge (concurring specially).
I concur with the majority's decision to overrule Blackmon's application for rehearing. I write specially with regard to this Court's decision to allow Blackmon to raise new issues in her application for rehearing. As a general rule neither this Court nor any other Alabama appellate court allows a party to raise new issues in its application for rehearing. See, e.g., Finley v. Patterson, 705 So.2d 834, 836 (Ala.1997) (See, J., concurring specially and noting that the Alabama Supreme Court will not ordinarily address issues that are raised for the first time on rehearing); Ex parte Jordan, 486 So.2d 485, 488 (Ala.1986) (noting that the Alabama Supreme Court does not normally consider issues that are raised for the first time on rehearing, but making an exception because the new argument was an extension of an argument that had been raised and addressed on original submission). See also Ex parte Hulsey, 536 So.2d 75, 78 (Ala.Civ.App.1988) (noting that, "`[w]hen an appellate court has rendered an opinion and an application for a rehearing has been filed, new issues which were not argued upon the original submission of the appeal generally will not be considered. Stover v. Alabama Farm Bureau Insurance Co., 467 So.2d 251 (Ala.1985).' Holsonback v. Holsonback, 518 So.2d 146, 148 (Ala.Civ.App.1987)."). But see Williams v. State, 627 So.2d 994, 995 (Ala.Crim.App. 1992) (opinion on application for rehearing), aff'd, 627 So.2d 999 (Ala.1993) (noting that the court did not find plain error on initial review, but nevertheless addressing issues that were raised by new counsel on rehearing "because we realize that other appellate courts will review this death penalty case").
Even though this case involves imposition of the ultimate punishment  the death penalty  just as was the case in Williams v. State, I question whether it was necessary to allow Blackmon's counsel to present new issues on rehearing, given that this Court searched the record for plain error during our initial review of Blackmon's appeal. See Rule 45A, Ala.R.App.P. Thus, had there been merit to any of these issues, this Court would have been required, pursuant to Rule 45A, Ala.R.App. P., to have noticed the errors. But for our previous holding in Williams v. State  together with the highly unusual facts of this case; namely, the fact that Blackmon's original appellate counsel had been suspended from the practice of law at the time our decision was released, leaving Blackmon without any legal representation  I would have dissented from the majority's decision to review the merits of the new issues raised by Blackmon on rehearing. Therefore, my vote in this case should not be taken as an indication that under normal circumstances I would allow *453 an appellant to raise new issues in an application for rehearing. Indeed, if this Court allowed parties to continue to raise entirely new issues on rehearing and then addressed those new issues, parties could conceivably file second and successive rehearing briefs raising new issues, and there would be no finality of judgments by this Court. However, given the unique facts of this case, I believe that prohibiting Blackmon's newly appointed appellate counsel from raising new issues in her application for rehearing would serve no purpose but to delay a final resolution of this case. Accordingly, I agree with the majority's decision to make an exception to our general rule prohibiting an appellant from raising new issues on rehearing.
NOTES
[1] The imprint on the victim's chest was so distinct that a photograph of the victim's chest introduced into evidence clearly showed the tread of the sole of a shoe.
[2] Numbers alone are not sufficient to establish a prima facie case of discrimination. The circuit court could have properly denied Blackmon's Batson motion without hearing the State's reasons for removing the black prospective jurors. Sharrief v. Gerlach, 798 So.2d 646 (Ala.2001).
[3] The State gave its reasons for removing six prospective black jurors. Apparently the State's last strike, an alternate, was also a black individual. "As provided in Rule 18.4(g)(3), [Ala.]R.Crim.P., `The last person or persons struck shall be the alternate or alternates....' Thus, the trial court should view the alternate jurors as having been struck for purposes of Batson and this court must `evaluate the State's explanation for striking [the alternate].' Ex parte Bankhead, 625 So.2d 1146, 1147 (Ala.1993)." Ashley v. State, 651 So.2d 1096, 1099 (Ala.Crim.App.1994).
[4] The holding in Ring applies to this case because this case was pending on direct appeal when that decision was released. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
[5] Blackmon was tried before the Alabama Supreme Court released its decision in McGriff.
[1] The Alabama Supreme Court has long stated that new issues may not be raised for the first time in an application for rehearing:

"We cannot sanction the practice of bringing up new questions for the first time in application for rehearing. Robinson v. Allison, 97 Ala. 596, 604, 12 So. 382, 604 [(1893)].
"An application for rehearing on ground not argued or suggested until after our judgment was rendered cannot be now considered."
Kirkland v. Kirkland, 281 Ala. 42, 49, 198 So.2d 771, 777 (1967).
[2] In the original brief, Blackmon argued only that the reasons given for striking six black prospective jurors were not race neutral. We found that all of the reasons were race neutral and did not violate Batson. Blackmon raises a new argument on rehearing.
[3] "A trial judge has a duty to be thorough, courteous, patient, punctual, just and impartial. Yet he is not required to be a `Great Stone Face' which shows no reaction to anything that happens in his courtroom. Allen v. State, 290 Ala. 339, 276 So.2d 583 (1973)." Gwin v. State, 425 So.2d 500, 506-07 (Ala. Crim.App.1982).
[4] Blackmon specifically cites the admission of State's exhibit 40  a confidential report from the DHR. However, this exhibit was not admitted into evidence.